## A99A1753. TOM'S AMUSEMENT COMPANY, INC. v. TOTAL VENDING SERVICES et al.

(533 SE2d 413)

MILLER, Judge.

The primary question on appeal is whether it constitutes tortious interference with contractual and business relations for one company to induce a competitor's current employee to disclose confidential financial information and for that company further to solicit customers via the employee's misrepresentations regarding the competitor's solvency. We hold it does.

Tom's Amusement Company, Inc. ("TAC") and Total Vending Services compete in placing coin-operated amusement games in various businesses in Atlanta. While employed by TAC as a route manager servicing games in Georgia, Alan Joseph secretly disclosed TAC's financial information to Total Vending (which had offered employment to Joseph) and in concert with agents of Total Vending solicited a TAC customer to give its business to Total Vending. As part of this solicitation, Joseph misrepresented TAC's financial status to the customer. Consequently, the customer (AMF) terminated its relationship with TAC at three locations and gave that business to Total Vending. After TAC fired Joseph in 1995 for breaching his duties to TAC, Total Vending hired him. Joseph then solicited other TAC customers, including CiCi's Pizza locations.

TAC sued Joseph and Total Vending and its agents (Schneider and Cotter) in seven counts for (1) tortious interference with contractual and business relations — against all defendants; (2) breach of contract to purchase Total Vending — against Schneider only; (3) disclosure of trade secrets — against Joseph only; (4) breach of noncompete covenants — against Joseph only; (5) conversion of corporate revenues — against Joseph only; (6) fraud arising out of the tortious interference, breach of contract, and conversion claims — against all defendants; and (7) federal and state Racketeer Influenced & Corrupt Organizations (RICO) Act violations — against all defendants. Defendants moved for summary judgment on all counts, which the trial court denied for the most part. But the court did grant partial summary judgment on the tortious interference, fraud (insofar as it arose out of the tortious interference), and the federal and state RICO claims, from which order TAC appeals. We affirm in part and reverse in part.

1. Summary judgment is proper only when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.[1] We review the evidence de novo in the light most

[1] OCGA § 9-11-56 (c).

favorable to the nonmovant.[2]

2. TAC contends that the defendants tortiously interfered with three contractual or business relationships: (a) TAC's business relationship with AMF, (b) TAC's employment of Joseph, and (c) TAC's business relationship with CiCi's. *Athens Intl. v. Venture Capital Properties*[3] reiterated the elements of these two separate torts:

> In establishing a cause of action for malicious or tortious interference with *business* relations, the appellants must demonstrate that the appellee (1) acted improperly and without privilege, (2) purposely and with malice with the intent to injure, (3) induced a third party or parties not to enter into or continue a business relationship with the appellants, and (4) for which the appellants suffered some financial injury. A cause of action for intentional interference with *contractual* rights must be based on the intentional and non-privileged interference by a third party with *existing* contractual rights and relations.[4]

(a) *AMF's Business Relationship*. TAC had been servicing AMF's seven Atlanta bowling alleys and thus had at least a business relationship if not an implied contract to continue.[5] While Joseph was still employed by TAC, Total Vending and its agents induced him to disclose TAC's confidential financial information about revenues from the AMF locations and to solicit AMF repeatedly to give its business to Total Vending. In these solicitations, Joseph misrepresented that TAC was experiencing financial problems and could not afford to buy needed games. AMF succumbed and switched the three most profitable locations to Total Vending.

This direct evidence found in sworn testimony, including testimony from AMF, supports an action for tortious interference. Defendants' joint actions were neither privileged nor proper. Although it appears Joseph did not hold fiduciary obligations at TAC, nevertheless, "an employee owes a duty of loyalty, faithful service and regard for an employer's interest."[6] Thus, before the end of his

---

[2] *Matjoulis v. Integon Gen. Ins. Corp.*, 226 Ga. App. 459 (1) (486 SE2d 684) (1997).

[3] 230 Ga. App. 286, 288 (2) (495 SE2d 900) (1998).

[4] (Citations and punctuation omitted; emphasis in original and supplied.) Id.

[5] See *Preferred Risk Ins. Co. v. Boykin*, 174 Ga. App. 269, 272-273 (2) (329 SE2d 900) (1985) (whole court) (unlawful interference with continuing relationship or implied agreement is actionable).

[6] (Punctuation omitted.) *Crews v. Roger Wahl, C.P.A., P.C.*, 238 Ga. App. 892, 901 (4) (d) (520 SE2d 727) (1999), approving as a correct statement of the law, *Lane Co. v. Taylor*, 174 Ga. App. 356, 362 (5) (330 SE2d 112) (1985) (physical precedent only); *Ga. Gulf Corp. v. Ward*, 701 FSupp. 1556, 1559 (N.D. Ga. 1987). The seemingly contradictory language found in *Physician Specialists &c. v. Wildmon*, 238 Ga. App. 730, 735 (3) (521 SE2d 358) (1999),

employment, no employee may solicit customers for a rival business nor otherwise directly compete with his employer's business.[7] Nor may he misrepresent his employer's financial status to persuade customers to change to the rival business.[8] To induce a breach of these duties is improper.

But TAC may pursue this tort only against Total Vending and its agents and not against its faithless employee Joseph, because only strangers to the contractual relationship *and* to the underlying business relationship are liable for tortious interference.[9] Regardless of whether an employee is acting as an agent of his employer when engaging in the interference, he is not a stranger to the business relationship between his employer and the customers he personally services and thus cannot be held liable under a claim of tortious interference.[10] But the competitor and its agents who assist in the interference can.[11]

(b) *Joseph's Employment Relationship.* Beginning in 1991 Joseph had a written employment contract with TAC for a one-year term that automatically renewed until terminated. The agreement contained a post-employment twelve-month noncompete covenant that was superseded by a two-year noncompete covenant contained in his 1995 termination agreement. While Joseph was still employed by TAC, Total Vending offered him employment, but he did not accept. TAC eventually terminated Joseph, and Total Vending hired him within a few months.

With regard to the written contract and the written termination agreement, the evidence is undisputed that Total Vending and its agents had no knowledge of these contracts until the filing of this lawsuit. These parties could not have intentionally and maliciously

---

must be restricted to its facts.

[7] *Instrument Repair Svc. v. Gunby,* 238 Ga. App. 138, 140 (1) (518 SE2d 161) (1999); *Nilan's Alley v. Ginsburg,* 208 Ga. App. 145 (1) (430 SE2d 368) (1993); *E. D. Lacey Mills, Inc. v. Keith,* 183 Ga. App. 357, 363 (9) (359 SE2d 148) (1987); compare *Nationwide Advertising Svc. v. Thompson Recruitment Advertising,* 183 Ga. App. 678, 680-681 (1) (359 SE2d 737) (1987) (no tortious interference where no evidence of solicitation before leaving employment).

[8] See *American Bldgs. Co. v. Pascoe Bldg. Systems,* 260 Ga. 346, 349 (2) (392 SE2d 860) (1990) (wrongful means include fraud, misrepresentation, or defamation); *Architectural Mfg. Co. v. Airotec, Inc.,* 119 Ga. App. 245, 250-251 (2) (166 SE2d 744) (1969) (misrepresentations as to company's financial solvency are improper means and may constitute element of tortious interference).

[9] *Atlanta Market &c. Co. v. McLane,* 269 Ga. 604, 609-610 (2) (503 SE2d 278) (1998) (endorsing cases reducing the number of entities against which tortious interference may be maintained and holding "*all* parties to an interwoven contractual arrangement are not liable for tortious interference with *any* of the contracts or business relationships") (citations omitted; emphasis supplied).

[10] See *Parks v. Multimedia Technologies,* 239 Ga. App. 282, 291-292 (3) (f) (520 SE2d 517) (1999).

[11] See id.

induced Joseph to breach their terms, for they must first have had knowledge of TAC's rights and have acted with the intent to interfere with them.[12] Evidence that Joseph "never informed any of [Total Vending's] agents of the existence of his employment contract with appellant and that to his knowledge [Total Vending] was not aware of the contract," precludes a cause of action for tortious interference with contractual relations against them.[13] Nor can Joseph be held liable for tortiously interfering with his own contracts.[14]

But Total Vending and its agents were certainly aware of Joseph's employment relationship with TAC and acted to interfere with that. In Georgia, a competitor's privilege of fair competition is lost

> when wrongful means in the solicitation of employees are utilized. [Cits.] Such wrongful means generally involve predatory tactics such as physical violence, fraud or misrepresentation, defamation, use of confidential information, abusive civil suits, and unwarranted criminal prosecutions.[15]

Direct evidence shows that before Joseph left TAC's employment, Total Vending induced him to breach his implied duty of loyalty by working with it to solicit a TAC customer to give its business to Total Vending, by giving it TAC's confidential financial information, and by misrepresenting TAC's financial solvency to the customer. TAC lost three AMF locations to Total Vending as a result. Although Total Vending and its agents can be held liable for interfering with TAC's employment relationship with Joseph, Joseph of course cannot.[16]

(c) *CiCi's Business Relationship.* TAC serviced various CiCi's locations, some of which were owned by the franchisor and the others by independent franchisees. TAC was listed as a preferred vendor by the franchisor, which was a recommendation to franchisees that they may wish to contract with TAC. After Joseph left TAC,[17] he solicited various CiCi's locations serviced by TAC to no avail. But he did persuade a new CiCi's franchisee opening a location in Smyrna to use Total Vending instead of TAC.

---

[12] *Derosa v. Shiah*, 205 Ga. App. 106, 110 (3) (421 SE2d 718) (1992).

[13] *Bible Farm Svc. v. House Hasson Hardware Co.*, 157 Ga. App. 358, 360 (3) (277 SE2d 341) (1981); see *Unigard Ins. Co. v. Zimmerman's, Inc.*, 151 Ga. App. 394, 396 (2) (259 SE2d 652) (1979), aff'd, 245 Ga. 475 (265 SE2d 774) (1980); cf. *Combs v. Edenfield*, 184 Ga. App. 75, 77 (360 SE2d 743) (1987).

[14] *Atlanta Market*, supra, 269 Ga. at 608 (2).

[15] *American Bldgs. Co.*, supra, 260 Ga. at 349 (2).

[16] Id.

[17] Although there is evidence that one solicitation took place before Joseph left TAC's employment, this solicitation was completely unsuccessful and caused no damages to TAC.

These actions do not constitute tortious interference by Total Vending. "[A]n employee is permitted to solicit his former customers on behalf of a new employer."[18] Fair competition is always legal, and absent a valid noncompete or nonsolicit covenant a former employee may go to customers whom he procured for the old employer and endeavor to persuade them to change their trade to his advantage.[19] True, Joseph himself had a noncompete agreement with TAC prohibiting such,[20] but the evidence is undisputed that no one at Total Vending was aware of that agreement until this lawsuit was filed. Absent such knowledge, the actions of Total Vending and its agents cannot meet the intent prong of the tort.[21] And as an integral part of TAC's business relationship with CiCi's, Joseph was not a stranger and thus cannot be liable for tortious interference.[22]

In summary, the trial court correctly granted summary judgment on all tortious interference claims with the following two exceptions: (i) the claim against Total Vending and its agents for interfering with TAC's contractual and business relationships with AMF and (ii) the claim against Total Vending and its agents for interfering with TAC's employment relationship with Joseph (insofar as Total Vending induced Joseph to solicit AMF, to disclose confidential information, and to misrepresent TAC's financial status to AMF).

3. The trial court also correctly entered summary judgment on TAC's fraud claim insofar as that alleged fraud was grounded on tortious interference. A fraud claim has five elements: (a) a false representation by the defendant, (b) scienter, (c) an intent to induce *the plaintiff* to act or refrain from acting, (d) justifiable reliance by *the plaintiff*, and (e) damage to the plaintiff.[23] TAC's evidence of tortious interference does not show that false representations were made to TAC with the intent to cause TAC to act in a certain way, nor does it show that TAC justifiably relied on such. Evidence that Joseph made false representations to others such as customers of TAC and that those customers acted thereon to change with whom they did business is irrelevant to a claim of fraud asserted by TAC.[24] The court correctly granted defendants summary judgment on this claim.

4. TAC also alleged claims based on the civil remedies available

---

[18] (Citation omitted.) *Contractors' Bldg. Supply v. Gwinnett Sash &c.*, 199 Ga. App. 38, 40 (2) (403 SE2d 844) (1991).

[19] *Airotec*, supra, 119 Ga. App. at 249 (1).

[20] We do not address the enforceability of that agreement.

[21] See *Unigard*, supra, 151 Ga. App. at 396 (2).

[22] See *Parks*, supra, 239 Ga. App. at 292 (3) (f).

[23] *Crawford v. Williams*, 258 Ga. 806 (375 SE2d 223) (1989); *Pyle v. City of Cedartown*, 240 Ga. App. 445, 447 (1) (524 SE2d 7) (1999).

[24] See *Maddox v. Southern Engineering Co.*, 216 Ga. App. 6, 7 (1) (453 SE2d 70) (1994).

under both the Georgia and federal RICO statutes.[25]

(a) Federal law rests liability on a showing of a pattern of racketeering activity or the collection of an unlawful debt.[26] A pattern of racketeering activity requires at least two acts of racketeering activity, which consist of various indictable offenses under federal or state law.[27]

Much of the evidence of alleged wrongdoing by the defendants here obviously does not constitute indictable offenses as defined in 18 USC § 1961 (1). The only evidence that comes close involves the allegations of mail and wire fraud.[28] Joseph misrepresented to AMF that TAC was experiencing financial problems and that TAC thus was unable to buy new equipment. TAC's president testified that these statements were untrue. The evidence shows that the mail and interstate wires were used in furtherance of this scheme.

But Joseph's misrepresentations were to AMF, not to TAC. Interpreting the proximate cause requirement of the federal RICO statute, the United States Court of Appeals for the Eleventh Circuit held in *Pelletier v. Zweifel*[29] that "when the alleged predicate act is mail or wire fraud, the plaintiff must have been a target of the scheme to defraud and must have relied to his detriment on misrepresentations made in furtherance of that scheme."[30] Because no misrepresentations were made to TAC upon which TAC relied, these allegations are not actionable under federal RICO law against any defendants.

(b) Under the Georgia RICO Act, a pattern of racketeering activity is also the linchpin to liability.[31] Georgia defines a pattern of racketeering activity as at least two interrelated acts indictable under certain categories of state and federal laws,[32] including those constituting a federal RICO violation.[33] The *Pelletier* requirement of detrimental reliance for mail or wire fraud claims also applies under Georgia's RICO statute to preclude such claims from serving as predicate acts here.[34] And because neither tortious interference nor

---

[25] See 18 USC §§ 1961-1964; OCGA §§ 16-14-1 through 16-14-6.

[26] 18 USC § 1962.

[27] 18 USC § 1961 (1), (5).

[28] See 18 USC §§ 1341; 1343.

[29] 921 F2d 1465 (11th Cir. 1991).

[30] (Citations omitted.) Id. at 1499-1500 (II) (A) (2) (b).

[31] See OCGA § 16-14-4.

[32] OCGA § 16-14-3 (8), (9); *Roth v. Connor*, 235 Ga. App. 866, 872 (4) (510 SE2d 550) (1998).

[33] OCGA § 16-14-3 (9) (A) (xxix).

[34] See *Gentry v. Volkswagen of America*, 238 Ga. App. 785, 791 (4) (521 SE2d 13) (1999); *Security Life Ins. Co. v. Clark*, 229 Ga. App. 593, 601 (1) (c) (494 SE2d 388) (1997), rev'd on other grounds, 270 Ga. 165 (509 SE2d 602) (1998); *Longino v. Bank of Ellijay*, 228 Ga. App. 37, 41 (2) (491 SE2d 81) (1997); *Huddleston v. R. J. Reynolds Tobacco Co.*, 66 FSupp.2d 1370, 1376 (III) (A) (N.D. Ga. 1999).

breach of contract is generally indictable under any of the listed laws, the Georgia RICO claim also must fail in this regard. Thus, the trial court correctly granted summary judgment on the federal and Georgia RICO claims based on the strictly tortious conduct.

(c) The single incident whereby Joseph allegedly gave $8,000 of TAC money to AMF as a cash incentive to enter into written agreements is not indictable as bribery under OCGA §§ 16-10-2, 16-12-33, or 16-12-34. Nor does this isolated incident evince any pattern of racketeering.[35]

(d) As against defendant Joseph individually, Georgia RICO claims may validly be predicated upon evidence that he repeatedly converted significant amounts of TAC money,[36] which is indictable conduct under OCGA § 16-8-4 (a).[37]

TAC hired an outside consultant with 27 years experience investigating misappropriation of corporate assets by employees, who monitored the internal meters in the games from which Joseph collected the money. These meters calculate the number of games played and the money that should be in the machine. Over a period of two months, in those machines serviced by Joseph, the "amount of money was always less than the meter readings," even after the meters were replaced. Amounts missing ranged from $25 to $300 per week per location, and the average shortfall per site over the two-month investigation was $100 per week. In our view, this is "precisely the conduct prohibited by the Georgia statute."[38] Consequently, as against Joseph individually, for those RICO claims based on proof that an employee repeatedly converted his employer's money, the grant of summary judgment was in error.

*Judgment affirmed in part and reversed in part. Pope, P. J., concurs. Smith, J., concurs in the judgment only.*

DECIDED MARCH 30, 2000 — ■■■■■■■■

*McCullough Sherrill, John A. Sherrill, R. Leslie Waycaster, Jr., Steven M. Staes,* for appellant.

*Seacrest, Karesh, Tate & Bicknese, Sanford R. Karesh, Edwin A. Tate II, Walker, Hulbert, Gray & Byrd, Lawrence C. Walker, Jr.,* for appellees.

---

[35] See, e.g., *Emrich v. Winsor,* 198 Ga. App. 333 (401 SE2d 76) (1991).
[36] OCGA § 16-14-3 (9) (A) (ix).
[37] See *Denmark v. State,* 44 Ga. App. 157, 164 (7) (161 SE 286) (1931).
[38] *Larson v. Smith,* 194 Ga. App. 698, 700 (391 SE2d 686) (1990).