A03A0614. LOONEY v. M-SQUARED, INC.
A03A0615. M-SQUARED, INC. v. LOONEY et al.

(586 SE2d 44)

RUFFIN, Presiding Judge.

M-Squared, Inc. ("M-Squared") sued Craig Looney, Robert Bandemir, and Thomas Schening, all former M-Squared employees, as well as Comrep, Inc., Looney's corporation, for fraud, tortious interference with prospective contractual relations, breach of fiduciary duty, misappropriation of corporate opportunity, and unfair trade practices.[1] At the close of evidence at trial, all parties moved for a directed verdict. The trial court denied M-Squared's motion, but directed a verdict for the defendants on various claims, including all allegations relating to Schening. The trial court ultimately submitted the following claims to the jury: (1) tortious interference with prospective contractual relations (as to Looney, Bandemir, and Comrep); (2) breach of fiduciary duty (as to Looney); and (3) misappropriation of corporate opportunity (as to Looney).

The jury found for Bandemir on M-Squared's tortious interference with prospective contractual relations claim. With respect to the other claims, however, it found in favor of M-Squared. Looney and Comrep subsequently moved for a judgment notwithstanding the verdict ("j.n.o.v."). M-Squared also sought a j.n.o.v. as to the jury's verdict for Bandemir. Although the trial court denied M-Squared's motion, it granted Looney and Comrep's motion regarding tortious interference with prospective contractual relations. As a result, only

---

[1] M-Squared also asserted claims for breach of the implied covenant of good faith and fair dealing and tortious interference with existing contract, and Looney counterclaimed to recover the value of his M-Squared stock. Those claims and the counterclaim, however, are not at issue in this appeal.

the jury's verdict against Looney for misappropriation of corporate opportunity and breach of fiduciary duty remained.

In Case No. A03A0614, Looney appeals the trial court's failure to enter judgment for him on these two claims. In Case No. A03A0615, M-Squared appeals the trial court's rulings granting the various defendants' motions for directed verdict and j.n.o.v.[2] For reasons that follow, we reverse the judgment in Case No. A03A0614, but affirm the judgment in Case No. A03A0615.

When reviewing a trial court's rulings on motions for directed verdict and j.n.o.v., we

> resolve the evidence and any doubts or ambiguities in favor of the verdict; directed verdicts and judgments n.o.v. are not proper unless there is no conflict in the evidence as to any material issue and the evidence introduced, with all reasonable deductions therefrom, demands a certain verdict.[3]

So viewed, the evidence shows that M-Squared, a corporation organized under the laws of North Carolina, distributes electronic components for manufacturers. At the beginning of 1994, Looney was an M-Squared officer, director, and shareholder, as well as territorial manager of the company's Atlanta office. As territorial manager, Looney was responsible for soliciting manufacturers — referred to as "lines" — to obtain the right to distribute their components.

In early 1994, M-Squared's president, Cecil Martin, learned that Fujitsu, a manufacturer, needed a new company to distribute its products. Fujitsu's area distribution manager, Jim Planche, was in the process of collecting profiles of interested companies. The decision as to which company would receive the Fujitsu line ultimately rested with Tom Sullivan, Fujitsu's vice president. But, since Looney knew Planche, Martin asked Looney to pursue the Fujitsu line on behalf of M-Squared. Martin testified that Looney was responsible for recruiting the Fujitsu business, which was worth approximately $20 million in sales.

According to Looney, he solicited the Fujitsu line, as well as the Vitramon line, on behalf of M-Squared between January and May 1994. On March 7, 1994, Looney submitted M-Squared's company profile to Planche. In a memo dated that same day, Looney informed Martin that M-Squared was officially "in the hunt" for an interview

---

[2] Court of Appeals Rule 27 (c) (1) requires that the sequence of arguments in the brief follow the order of the enumeration of errors and be numbered accordingly. In its briefs to this Court, M-Squared has chosen to ignore this rule, thereby hindering our ability to fully and efficiently consider its arguments. Nonetheless, we have, to the best of our ability, attempted to address all arguments that are clearly set forth in M-Squared's briefs.

[3] (Punctuation omitted.) *Paul v. Destito*, 250 Ga. App. 631 (550 SE2d 739) (2001).

with Fujitsu. Although numerous firms were competing for the line, Fujitsu only planned to interview six or seven companies before making a final decision. Looney made several follow-up calls to Planche's office between March 7, 1994, and the end of April 1994 on M-Squared's behalf. Planche testified that he considered M-Squared to be a viable candidate and was willing to give the company an interview based on his relationship with Looney.

At the beginning of May, however, Planche learned that Looney had formed his own company and wanted to pursue the Fujitsu line on its behalf. The evidence shows that, in March or April 1994, Looney and Bandemir, an M-Squared salesman, decided to leave M-Squared and start a new venture. On May 3, 1994, Martin became aware of their plans. The next day, Martin met with Looney and Bandemir, who submitted letters of resignation. After Looney's departure, Martin appointed Schening territorial manager of the Atlanta office. Following these departures, M-Squared did not pursue the Fujitsu or Vitramon business.

Looney's new venture, Comrep, was incorporated in June 1994, with Looney as president and Bandemir as secretary and treasurer. The evidence further shows that Looney met with several manufacturers on behalf of Comrep, including Fujitsu and Vitramon. Although not yet incorporated, Comrep interviewed with Fujitsu and Vitramon in the middle of May 1994. The first week of June 1994, Vitramon announced that Comrep would be its new representative. At the beginning of August 1994, Comrep also secured the Fujitsu line. Later that month, Schening resigned from M-Squared and joined Comrep.

### Case No. A03A0614

1. Looney argues that the trial court should have granted his motions for directed verdict and j.n.o.v. on M-Squared's claim for misappropriation of corporate opportunities. He asserts that M-Squared failed to prove that it had any interest or expectancy in these opportunities, precluding recovery.

Both parties agree that the law of North Carolina, where M-Squared was incorporated, applies to its claim for misappropriation of corporate opportunity.[4] In North Carolina, a corporate officer may not act " 'in any . . . double capacity to appropriate business for himself belonging legitimately to his corporation and to reap the profits of it.' "[5] This "corporate opportunity doctrine" is " 'a species of the

---

[4] See *Diedrich v. Miller & Meier & Assoc.*, 254 Ga. 734, 735-736 (1) (334 SE2d 308) (1985).

[5] *Meiselman v. Meiselman*, 309 N.C. 279, 307 (307 SE2d 551) (1983).

duty of a fiduciary to act with undivided loyalty. . . . [I]n general, a corporate officer or director is under a fiduciary obligation not to divert a corporate business opportunity for his own personal gain.' "[6] When presented with such a claim, the factfinder must determine whether the allegedly usurped opportunity was functionally related to the corporation's business, as well as whether the corporation had an interest or expectancy in the opportunity.[7] The following factors may be considered:

> 1) the ability, financial or otherwise, of the corporation to take advantage of the opportunity; 2) whether the corporation engaged in prior negotiations for the opportunity; 3) whether the corporate director or officer was made aware of the opportunity by virtue of his or her fiduciary position; 4) whether the existence of the opportunity was disclosed to the corporation; 5) whether the corporation rejected the opportunity; and 6) whether the corporate facilities were used to acquire the opportunity.[8]

In this case, two business opportunities are at issue — representing the Fujitsu line and representing the Vitramon line. Looney testified that he actively recruited both lines for M-Squared between January and May 1994. And, according to Martin, M-Squared was capable of servicing those lines at that time. Martin also admitted, however, that after Looney and Bandemir left the company, M-Squared stopped pursuing the business, electing instead to focus on existing lines. As described by M-Squared, once Looney and Bandemir departed, the company "was left in the unfortunate position of making the choice whether to engage in damage control and focus on existing lines or risk being spread too thin and continuing the pursuit of the Fujitsu and Vitramon lines."

The Vitramon line did not become available until after Looney and Bandemir left M-Squared and was not awarded to Comrep until June. Comrep also did not secure the Fujitsu business until August 1994. And a Fujitsu representative told Martin shortly before or after May 4, 1994, that "he saw no reason why [M-Squared] would not get an interview." Planche similarly testified that he would have considered M-Squared for an interview at that time. Nevertheless, M-Squared did not pursue the opportunity.

The evidence thus shows that M-Squared *could* have pursued these business opportunities after Looney and Bandemir resigned

---

[6] Id.

[7] See id. at 311-312.

[8] *Lowder v. All Star Mills*, 75 N.C. App. 233, 240 (330 SE2d 649) (1985).

but elected not to so that it could focus on existing business with its smaller staff. We recognize that Looney apparently solicited the Fujitsu and Vitramon lines on Comrep's behalf before his May 4, 1994 resignation. That conduct, however, cannot be tied to M-Squared's failure to obtain the business. Instead, M-Squared chose not to avail itself of the opportunities, about which it clearly was aware, because it did not want to "spread . . . itself too thin" following Looney and Bandemir's departure. Accordingly, M-Squared had no interest or expectancy in the Fujitsu and Vitramon opportunities, entitling Looney to a directed verdict on this claim.[9]

2. The trial court also erred in refusing to direct a verdict on M-Squared's breach of fiduciary duty claim. Once again, the parties agree that North Carolina law applies to this claim. In North Carolina, corporate officers and directors owe a fiduciary duty to the corporation, requiring them to act in good faith and for the interest of the company.[10]

On appeal, Looney argues that M-Squared's breach of fiduciary duty and misappropriation of corporate opportunity claims are "co-extensive" in that both revolve around the alleged misappropriation. M-Squared makes no effort to dispute this assertion or cogently argue that any conduct other than the alleged misappropriation rises to the level of a breach. And we have already found that Looney did not misappropriate a corporate opportunity. Accordingly, Looney was entitled to a directed verdict on this claim.[11]

3. Our holding in Divisions 1 and 2 render Looney's remaining enumeration of error moot.

### Case No. A03A0615

In multiple enumerations of error, M-Squared challenges the trial court's grant of directed verdicts and j.n.o.v. to the defendants on various claims.

4. *Fraud.* M-Squared first argues that the trial court erred in directing a verdict for Looney, Comrep, Bandemir, and Schening on its fraud claim. We disagree.

---

[9] See *Boyd v. Howard*, 147 N.C. App. 491, 494-495 (556 SE2d 337) (2001) (no usurpation of corporate opportunity where corporation did not have financial ability to take advantage of opportunity). Although Planche testified at trial that M-Squared was a viable candidate and would be considered for an interview, he also indicated that, ultimately, he would not have recommended that M-Squared receive the business because he had concerns about the company's stability, even before Looney and Bandemir departed. Such evidence further undermines M-Squared's claim that it had an opportunity to obtain the Fujitsu line.

[10] See *Schwartzbach v. Apple Baking Co.*, 109 N.C. App. 216, 218-220 (426 SE2d 438) (1993).

[11] See *Meiselman*, supra at 307-309.

A claimant must prove five elements to sustain a fraud claim: "(1) a false representation or omission of material fact; (2) scienter; (3) an intent to induce the party alleging fraud to act or refrain from acting; (4) justifiable reliance; and (5) damages."[12] M-Squared contends that Looney, with the assistance of Bandemir, Schening, and Comrep, led M-Squared to believe that he was pursuing the Fujitsu and Vitramon lines for the company, while actually seeking the lines on behalf of Comrep. In essence, M-Squared alleges that the defendants' fraud prevented it from obtaining these lines.

As found in Division 1, however, Looney's efforts to secure the lines for Comrep did not prevent M-Squared from obtaining the business. Instead, M-Squared *chose* not to pursue new clients to avoid "being spread too thin." Thus, even assuming that some fraud occurred, M-Squared failed to show how that fraud caused any injury. It follows that the trial court properly directed a verdict for all defendants on this claim.[13]

5. *Tortious Interference With Prospective Business Relations.* Similarly, we fail to see how the defendants interfered with M-Squared's prospective business relations. To prevail on this claim, M-Squared must show that the defendants: "(1) acted improperly and without privilege, (2) acted purposely and with malice with the intent to injure, (3) induced a third party or parties not to enter into or continue a business relationship with the plaintiff, and (4) caused plaintiff financial injury."[14] Furthermore, M-Squared "must demonstrate that absent the interference, [the prospective business] relations were reasonably likely to develop."[15]

Once again, M-Squared argues that the various defendants interfered with its prospective relations with Fujitsu and Vitramon by soliciting those lines on behalf of Comrep. The evidence clearly shows, however, that, once Looney and Bandemir left the company, M-Squared decided not to pursue the lines. Thus, even if Comrep had failed to obtain the Fujitsu and Vitramon business, M-Squared would not have formed a relationship with these companies. It follows that M-Squared cannot prove that any prospective relationships were reasonably likely to develop.[16]

---

[12] *Paul,* supra at 635 (1).

[13] See id.; see also *DCA Architects v. American Bldg. Consultants,* 203 Ga. App. 598, 601-602 (3) (417 SE2d 386) (1992) (directed verdict on fraud claim proper where claimant failed to prove damage).

[14] (Emphasis omitted.) *Renden, Inc. v. Liberty Real Estate Ltd. Partnership III,* 213 Ga. App. 333, 334 (2) (444 SE2d 814) (1994).

[15] Id. at 335.

[16] M-Squared did not enumerate as error the trial court's refusal to overturn the jury's verdict for Bandemir on this claim. We note, however, that for the reasons discussed above, the trial court's ruling as to Bandemir also was proper.

6. *Breach of Fiduciary Duty.* M-Squared also challenges the trial court's decision to direct a verdict for Bandemir, Schening, and Comrep on its breach of fiduciary duty claim. Again, we disagree.

Even assuming, without deciding, that these defendants owed such a duty to M-Squared, the company has not shown a breach.[17] On appeal, M-Squared asserts that "Bandemir and Schening, as representatives of Comrep, began using their positions [at M-Squared] to pursue the Fujitsu and Vitramon lines for Comrep in breach of their fiduciary duties." M-Squared has articulated no other basis for its fiduciary duty claim, leaving us to conclude, as we did with Looney, that this claim relates to the alleged misappropriation of corporate opportunity and M-Squared's loss of the Fujitsu and Vitramon lines. As we have already determined, the defendants' conduct did not result in any misappropriation. Thus, the directed verdict was proper.[18]

7. *Misappropriation of Corporate Opportunities.* Next, M-Squared alleges that the trial court improperly directed a verdict for Comrep on its claim for misappropriation of corporate opportunity. Since no misappropriation occurred, this claim fails.

8. *Uniform Deceptive Trade Practices Act.* M-Squared further argues that the trial court erred in directing a verdict for all defendants on its claim under Georgia's Uniform Deceptive Trade Practices Act ("the Act").[19] We find no error.

The evidence shows that, during Comrep's planning stages, Looney used M-Squared's letterhead in corresponding with a potential investor. Looney also sent that investor information gathered by M-Squared regarding the electronics market. According to Martin, M-Squared used this information to familiarize itself with the marketplace. Furthermore, at one point, Bandemir apparently crossed through M-Squared's name on his business card, wrote "Comrep, Inc." on the card, and gave it to a warehouse representative with whom he was discussing warehouse space. According to M-Squared, such conduct shows that the defendants tried to pass off M-Squared's goods or services as their own in violation of OCGA § 10-1-372 (a).

Under the Act, a person engages in deceptive trade practices, if, among other things, he:

(1) [p]asses off goods or services as those of another; (2) [c]auses likelihood of confusion or of misunderstanding as to

---

[17] It is difficult to imagine how Comrep owed such a duty to its competitor, M-Squared.

[18] We recognize that, in directing a verdict for Schening and Bandemir, the trial court did not rule on this basis. But "[i]f a judgment entered pursuant to the granting of a directed verdict is right for any reason, it will be affirmed." *Fowler v. Smith*, 230 Ga. App. 817, 821 (3) (498 SE2d 130) (1998).

[19] OCGA § 10-1-370 et seq.

the source, sponsorship, approval, or certification of goods or services; (3) [c]auses likelihood of confusion or of misunderstanding as to affiliation, connection, or association with or certification by another; . . . or (12) [e]ngages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.[20]

While actual confusion need not be shown to sustain a claim under the Act,[21] M-Squared has nonetheless failed to show that Looney and Bandemir's conduct caused any likelihood of confusion or misunderstanding. Bandemir apparently crossed out M-Squared's name on the business card he distributed. And, in the correspondence sent to the potential investor, Looney referenced Comrep and stated that he and Bandemir needed to "cut . . . ties with [their] current employer." Moreover, the market information sent to the investor did not reference M-Squared. Finally, we cannot discern, and M-Squared has made no effort to argue, how the defendants "passed off" M-Squared's goods and services as their own by using these documents or the internal market information. Accordingly, the trial court properly directed a verdict for the defendants on M-Squared's claim under the Act.[22]

9. M-Squared's remaining enumeration of error is moot.

*Judgment reversed in Case No. A03A0614. Judgment affirmed in Case No. A03A0615. Smith, C. J., and Miller, J., concur.*

DECIDED JULY 9, 2003 —
RECONSIDERATION DENIED JULY 25, 2003 — 

*Richardson & Chenggis, George G. Chenggis, Kilpatrick Stockton, Craig E. Bertschi*, for Looney et al.
*Kenison & Dudley, Keven K. Kenison, Joel F. Geer*, for M-Squared, Inc.

---

[20] OCGA § 10-1-372 (a).
[21] See OCGA § 10-1-372 (b).
[22] See *Wolff v. Protege Systems*, 234 Ga. App. 251, 256 (6) (506 SE2d 429) (1998) (plaintiff not entitled to relief under DTPA because it failed to offer evidence that defendant tried to "pass off" its services as those of plaintiff), disapproved on other grounds, *Advance Technology Consultants v. RoadTrac, LLC*, 250 Ga. App. 317, 321 (2) (551 SE2d 735) (2001).