A03A2565. GALARDI et al. v. STEELE-INMAN.

(597 SE2d 571)

JOHNSON, Presiding Judge.

Vanessa Steele-Inman ("Steele") was a contestant in the 1997 Miss Nude World International pageant. Extravaganza Promotions, Inc. promoted the pageant, which was held at the Pink Pony, an adult entertainment club. Jack Galardi (CEO of Trop, Inc., d/b/a the Pink Pony), and his employees Jack Pepper and Mark Allen were the pageant's operators. Toward the end of the six-day competition, rumors circulated that Steele had "stuffed" the ballot box in one of the preliminary competitions and that she had told other contestants that she "bought" the contest. Ostensibly based on those allegations, Steele was barred from the premises of the Pink Pony and, effectively, eliminated from the pageant.

Steele sued numerous parties, including Galardi, Trop, Inc., and Pepper. In her complaint, Steele raised claims based on slander, tortious interference with business relations, and violations of OCGA § 10-1-830 et seq. ("the beauty pageant statutes").[1] A jury awarded Steele $335,000 for tortious interference with business relations against Galardi, Trop, Inc. and Pepper; $100 for fraud against Extravaganza Promotions; $500,000 against Galardi, Trop, Inc., and Pepper for slander; and $100,000 in attorney fees against Galardi, Trop, Inc., and Pepper. The trial court entered judgment for these amounts, and awarded Steele an additional $3,500 in attorney fees against Galardi, Trop, Inc., and Pepper under Georgia's beauty pageant statutes. Galardi, Trop, Inc., and Pepper (collectively "the appellants") appeal.[2]

1. *Slander claim as to Galardi and Trop, Inc.* Galardi and Trop, Inc. contend the trial court erred in denying their motions for a directed verdict, for a new trial, and for judgment notwithstanding the verdict when there is no evidence that they slandered Steele. Galardi claims he cannot be liable since there is no evidence that he said the offensive words. Trop, Inc. urges that it, as a corporation, cannot be guilty of slander because it did not expressly order an officer or agent to say the words at issue. We agree with Galardi and Trop, Inc. and reverse the judgment as to them on the slander claim.

---

[1] Steele also sued other parties and raised other claims that are not the subject of this appeal.

[2] This is the second appearance of this case before this Court. In the original appeal, we remanded the case for the trial court to supplement the appellate record with videotape evidence which had been shown to the jury but omitted from the record on appeal. *Galardi v. Steele-Inman*, 259 Ga. App. 249 (576 SE2d 555) (2003). The videotapes are now part of the appellate record.

The standard of appellate review of a trial court's denial of a motion for a directed verdict or motion for judgment notwithstanding the verdict is the "any evidence" test.[3] The question before this court is not whether the verdict and judgment of the trial court were merely authorized, but whether a contrary verdict was demanded.[4] A judgment n.o.v. or a directed verdict is authorized when there can be only one reasonable conclusion as to the proper judgment; if there is any evidentiary basis for the jury's verdict, viewing the evidence most favorably to the party who secured the verdict, it is not error to deny the motion.[5] The issues of a directed verdict and judgment n.o.v. are reviewed on the same basis.[6] The denial of a motion for a new trial is a matter within the sound discretion of the trial court and will not be disturbed if there is any evidence to authorize it.[7]

Viewed in favor of the verdict, the evidence shows that the pageant was held from September 22 though September 27, 1997, at the Pink Pony. Extravaganza Promotions, Inc., of which Samantha Jones was CEO, entered into a written agreement with Galardi, Pepper, and Allen, wherein Extravaganza would promote the pageant and Galardi, Pepper and Allen would serve as event operators, providing staff and the venue for the event.

Steele worked in the adult entertainment industry as a "feature entertainer," meaning she performed "a showgirl type Las Vegas Review." As such, Steele commanded a higher salary than typical exotic dancers. She also owned and operated a school that taught performers how to become feature entertainers. Steele paid a fee to enter the pageant and entered into a written contract with Extravaganza wherein she agreed to be a contestant. Steele retained a costume designer who created several costumes for her. Steele also bought promotional items such as mouse pads and sunglasses, fliers to be distributed before and during the pageant, and an advertisement in a pageant brochure.

The pageant consisted of several preliminary contests throughout the week, and culminated with the final competition on the sixth day. One of the preliminary contests was "Gentlemen's Favorite." In it, customers voted by written ballot for the winner. Steele participated in that contest and finished as first runner-up. That finish qualified her for the semi-finals.

---

[3] *Professional Consulting Svcs. of Ga. v. Ibrahim*, 206 Ga. App. 663, 665 (1) (426 SE2d 376) (1992).
[4] Id.
[5] Id.
[6] Id.
[7] Id.

As part of the competition, contestants were expected to participate in various activities, one of which was a golf tournament. Steele testified that during the golf tournament she was asked to participate in a photo shoot which she found offensive. Steele testified that when she refused, Galardi became angry.

After the incident, Pepper, who worked for Galardi, told Jones that witnesses saw Steele walking around with a stack of ballots and heard her comment that she had "bought" the contest. Pepper told Jones that he had witnesses to support the allegations, and that Steele was to be barred from the premises of the Pink Pony.

Jones subsequently summoned Steele to a hotel room to discuss the situation. When Steele arrived in the room, Jones was accompanied by her assistant, another pageant official, and photographers. The meeting was videotaped. In the meeting, Jones told Steele of Pepper's allegations and said she was barred from the Pink Pony because of the ballot improprieties and Steele's remark about having "bought" the contest. Steele vehemently denied the accusations.

Steele testified that after being barred from the Pink Pony, and being effectively precluded from participating in the pageant, she could not find work as an adult entertainer. Steele testified:

> no agent would take me. They all felt that I was not a promising person anymore, I had a bad reputation. . . . Pretty much everybody in the industry, including the major magazines, every agent, every photographer that I knew, every individual feature knew that I had competed in the contest and was told by many people that I had cheated, so I could not get a job.

Steele added that even her feature entertainer school failed after the contest, and that she was effectively put out of business after being disqualified from the contest.

A corporation is not liable for the slanderous utterances of an agent acting within the scope of his employment, unless it affirmatively appears that the agent was expressly directed or authorized to slander the plaintiff.[8] For liability to attach, the corporation must expressly order and direct the agent to say those very words.[9] Trop, Inc. contends there is no evidence affirmatively showing that it expressly directed or authorized Pepper to make the statements in question.

---

[8] See *Kramer v. Kroger Co.*, 243 Ga. App. 883, 886 (2) (a) (534 SE2d 446) (2000); *First United Church v. Udofia*, 223 Ga. App. 849, 852 (2) (479 SE2d 146) (1996).

[9] *First United Church*, supra.

As Steele points out, the evidence shows that Galardi was the sole shareholder, president, and chief executive officer of Trop, Inc., that there were no other directors and only one other officer of the corporation, that Allen was the general manager of the Pink Pony, and that Pepper worked for Galardi. The evidence further shows that Allen investigated the allegations and spoke to Pepper about them, and Pepper subsequently told Jones that Steele said she "bought" the contest, that she was seen "stuffing the ballot box," that "there were accusations about [Steele] cheating on the contest," that there were more ballots than there were customers, that ballots were "all filled out in the same handwriting," that the ballots had Steele's name on them, and that Steele was therefore barred from the club.

The evidence does not establish that Trop, Inc. published any slanderous statements or directed Pepper to publish the particular statements he may have made about Steele. Steele urges that Pepper was acting as Galardi's "personal representative" when he told Jones that Steele was being barred from the club for cheating. However, the doctrine of respondeat superior does not apply in slander cases.[10] And, although the evidence shows that Galardi owned and controlled Trop, Inc., and that Pepper worked for Galardi, there is no evidence showing that Trop, Inc. "expressly ordered and directed [Pepper] to say those very words."[11]

Steele contends that the meeting videotape shows that Jones "recounted to everyone present exactly what Pepper told her." The asserted facts show what Pepper said, but do not show that Trop, Inc. authorized or directed the statements. Likewise, Steele argues that Jones' deposition shows that "someone from Trop" said that Steele remarked that she "had spent . . . money . . . to win this pageant," and that Pepper banned her from the club for breaking the rules. Jones did not say who the "someone" was, but she had been referring to Allen and Pepper just before and right after she gave this testimony. Again, the asserted facts demonstrate, at most, that Pepper or Allen made defamatory statements about Steele.

Finally, Steele relies on Galardi's deposition testimony "to put to rest any doubts about Galardi's role in all of this." But the cited testimony merely establishes that Galardi owned the club and that Pepper worked for him. It does not establish that Galardi made or directed any slanderous remarks. The evidence is insufficient to establish Galardi's liability because, as stated above, the doctrine of respondeat superior does not apply in slander cases.[12] The trial court

---

[10] Id.

[11] See *Kramer*, supra.

[12] See id.

erred in denying Galardi's and Trop, Inc.'s motion for a directed verdict, for judgment n.o.v., or for a new trial as to the cause of action for slander.

2. *Slander claim as to Pepper.* Pepper argues that even if he did make those statements to Jones, he cannot be liable for slander because such communications are privileged and do not constitute publication. We agree.

> Publication is indispensable to recover for slander. Generally, publication is accomplished by communication of the slander to anyone other than the person slandered. Over the years, however, an exception to the broad definition of publication has evolved: when the communication is intracorporate, or between members of unincorporated groups or associations, and is heard by one who, because of his/her duty or authority has reason to receive information, there is no publication of the allegedly slanderous material, and without publication, there is no cause of action for slander.[13]

This rule is based on the legal fiction that such statements are the legal equivalent of speaking only to one's self.[14] The relevant question is whether, because of Jones' duty or authority, she had reason to receive the information from Pepper about Steele's alleged cheating.[15] We hold that she did.

Although Extravaganza and Trop, Inc. were separate corporations, the parties were engaged in a joint enterprise for the purpose of conducting this pageant. The written agreement between Extravaganza (the promoter) and Galardi, Pepper and Allen (the operators), provided that the promoter and operators would have certain specified duties in connection with the competition. For instance, the contract provided that the operators/appellants would provide the premises for the contest and keep the stage clean and clear at all times, decorate the premises, select the judges and provide a maximum of two contestants for the pageant, provide dressing rooms for the contestants, provide door prizes, pay a fee to the agent of any contestant who performed at the Pink Pony during the six-month period following the pageant, provide a person to witness the tallying of votes, *prohibit disqualified contestants from entering the premises*

---

[13] (Citations and punctuation omitted.) *Terrell v. Holmes*, 226 Ga. App. 341, 342 (1) (487 SE2d 6) (1997); see *ITT Rayonier, Inc. v. McLaney*, 204 Ga. App. 762, 764 (2) (420 SE2d 610) (1992); *Kurtz v. Williams*, 188 Ga. App. 14, 15 (3) (371 SE2d 878) (1988).

[14] *O'Neal v. Home Town Bank of Villa Rica*, 237 Ga. App. 325, 334-335 (8) (514 SE2d 669) (1999).

[15] See *Terrell*, supra at 343 (1).

*during the competition*, and "use [their] best efforts to ensure that the Promotion is successful."

Furthermore, the agreement provided that Extravaganza was required to give the operators one-half of the profits from on-premises events, provide "audience favorite" ballots, provide emcees and coordinators, select most of the contestants, provide cash and prizes for the winners, and establish the rules for the contest. It also provided that Extravaganza *was responsible for disqualifying contestants.* This was clearly a business venture which this association — consisting of pageant operators and a promoter — fully undertook together.

Given the business relationship these parties had in connection with this particular venture, it is to be expected that Jones would be consulted by Pepper (or Galardi or Allen) regarding a matter as significant as the banning of a contestant from the contest premises. As the contest's promoter, Jones had reason to be advised of the allegedly improper acts of a contestant in the parties' pageant.[16] In fact, Pepper had a duty to notify Jones of the allegations. Therefore, Pepper's communication to Jones about alleged violations of pageant rules was privileged. Pepper was entitled to a directed verdict, judgment n.o.v., or new trial on the slander claim.

3. *Tortious interference with business relations.* The appellants assert that the trial court should have granted their motion for a judgment n.o.v. or for a new trial because there was no evidence that they tortiously interfered with Steele's business relations. Specifically, they maintain that they cannot be liable because they were not strangers to any of the relationships involving Trop, Inc. or Galardi, and Steele failed to prove that the appellants did anything to affect Steele's business relations with entities unrelated to Trop, Inc. and Galardi. We agree, and reverse the trial court's entry of judgment for Steele on her tortious interference claim.

A claim of tortious interference with business relations requires proof that the defendants acted improperly, *without privilege*, and with intent to induce *a third party* or parties not to enter into or continue a business relationship with Steele, causing injury to Steele.[17]

For the reasons discussed above, Pepper and Allen (as well as Galardi), formed an association with Extravaganza in order to promote and operate the pageant. Because of Jones' duty and authority

---

[16] See id.

[17] *Parks v. Multimedia Technologies*, 239 Ga. App. 282, 291 (3) (f) (520 SE2d 517) (1999).

in connection with the contest, she had reason to receive the information about alleged misconduct by a pageant contestant. Therefore, the communication was privileged and a claim for tortious interference with business relations cannot lie.[18]

Furthermore, we note that even if there was no privilege, the tortious interference claim as to Steele's business relations with Extravaganza, Galardi or Trop, Inc., would fail because the appellants were not strangers to those relationships.

In order for a defendant to be liable for tortious interference with contractual or business relations, one must be a stranger to both the contract *and the business relationship* giving rise to and underpinning the contract.[19] In other words, all parties to a comprehensive interwoven set of contracts are not liable for tortious interference with any of the contracts or business relationships.[20] It is clear that the appellants were not strangers to the business relationships between Extravaganza, Galardi, Trop, Inc. and Steele. Prior to engaging in the alleged tortious conduct, the appellants entered into a written contract with Extravaganza for the promotion and operation of the pageant in which Steele would be a contestant. The agreement provided, among other things, that the appellants would select the judges and provide a maximum of two contestants for the pageant, and that the appellants were required to provide dressing rooms for the contestants, pay a fee to the agent of any contestant who performed at the Pink Pony during the six-month period following the pageant, provide a person to witness the tallying of votes, and prohibit disqualified contestants from entering the premises during the competition. Mindful of the Supreme Court's recent suggestion that we "reduce the number of entities against which a claim of tortious interference with contract may be maintained,"[21] we conclude that the appellants were not strangers to the business relationships at issue and therefore cannot be held liable for tortious interference with Steele's relationships with Extravaganza, Galardi or Trop, Inc.[22]

Nor was Steele entitled to judgment on her claim of tortious interference with business relations with other entities. To establish

---

[18] See *Choice Hotels Intl. v. Ocmulgee Fields*, 222 Ga. App. 185, 188 (2) (474 SE2d 56) (1996).

[19] See *Atlanta Market Center Mgmt. Co. v. McLane*, 269 Ga. 604, 608 (2), 609, n. 2 (503 SE2d 278) (1998).

[20] Id. at 610.

[21] (Punctuation omitted.) *Parks v. Multimedia Technologies*, supra at 292 (3) (f), citing *Atlanta Market Center Mgmt. Co. v. McLane*, supra.

[22] See *Calhoun v. Cullum's Lumber Mill*, 247 Ga. App. 859, 865 (3) (545 SE2d 41) (2001); see generally *Tom's Amusement Co. v. Total Vending Svcs.*, 243 Ga. App. 294, 296 (2) (a) (533 SE2d 413) (2000).

a cause of action for interference with prospective business relations, she was required to demonstrate that absent the interference, those relations were reasonably likely to develop in fact.[23]

Steele testified that after she was labeled a "cheater," she lost her booking agent and was unable to hire a new agent, had to close her training school, and was unable to acquire new bookings. She also testified that her elimination from the contest based on charges of cheating cost her bookings which would have tripled her fees, and caused her to lose opportunities to appear on television and in national magazines.

However, there is no direct evidence that the appellants interfered with her prospective business relations or that they had any contact with any entities which refused to hire Steele. It is not sufficient that the appellants prevented her from participating in their own pageant based on allegations of wrongdoing. She was required to offer evidence that they *interfered* with prospective business relations,[24] or *induced* a third party not to enter into or continue a business relationship with her,[25] and that absent the appellants' interference, she would have formed relationships with these companies.[26] In the absence of any direct evidence linking the appellants' actions to her alleged loss of work and earnings following the pageant, the jury was forced to speculate that the appellants were responsible for her potential business losses.[27] It follows that the appellants were entitled to judgment as a matter of law based on Steele's failure to prove they interfered with her prospective business relations. Accordingly, the judgment for tortious interference with business relations must be reversed as to each of the appellants.

4. *Attorney fees.* According to the special verdict form, the jury found that Jones, Extravaganza, Galardi, Trop, Inc., and Pepper each violated the beauty statutes' requirements regarding the providing of certain information to contest entrants, the posting of a bond, and the maintaining of an escrow account.[28] There is evidence to support this finding. Moreover, the appellants have not enumerated as error the jury's findings that they violated the beauty pageant statutes; those findings therefore stand. The beauty pageant statutes allow an award of attorney fees and litigation expenses for violations thereunder.[29]

---

[23] See *Wilson v. City of Sardis*, 264 Ga. App. 178, 179-180 (2), (3) (590 SE2d 383) (2003).

[24] See id.

[25] See *Looney v. M-Squared, Inc.*, 262 Ga. App. 499, 504 (5) (586 SE2d 44) (2003).

[26] See id.

[27] See generally *Camp v. Eichelkraut*, 246 Ga. App. 275, 279 (2) (539 SE2d 588) (2000).

[28] OCGA §§ 10-1-831; 10-1-832; 10-1-837.

[29] See OCGA §§ 10-1-835; 10-1-399.

Although the jury did not specify a fee award based on the beauty pageant statutes, the trial court did. In entering judgment, the trial court entered a $3,500 attorney fee award against the appellants — expressly indicating that the award was for beauty pageant statute violations.

The appellants argue that the trial court erred in entering the $3,500 fee award because the jury presumably included an award pursuant to those statutes within its $100,000 fee award. That argument is rendered moot by our holding that the judgments on the slander and tortious interference with business relations claims must be reversed. Because we reverse the judgments on the tortious interference and slander claims, Steele is not entitled to recover attorney fees and litigation costs related to those claims. Therefore, the award of $100,000 for attorney fees must be reversed. The award of $3,500 for attorney fees pursuant to the beauty pageant statutes stands as entered.

*Judgment affirmed in part and reversed in part. Eldridge and Mikell, JJ., concur.*

DECIDED MARCH 24, 2004 — 

*Aubrey T. Villines, Jr., Heidi A. Honis*, for appellants.
*Spix, Krupp & Reece, Spencer J. Krupp, Lawrence L. Bennett, Jr.*, for appellee.

