**In re Joy A. PERVIS, Debtor.**

**Hot Shot Kids Inc. and Brenda Pauley, Plaintiffs,**

**v.**

**Joy A. Pervis, Defendant.**

**Bankruptcy No. 10–75270–WLH.
Adversary No. 10–9061.**

United States Bankruptcy Court,
N.D. Georgia,
Atlanta Division.

July 24, 2013.

Quynh–Huong Nguyen Davis, Law Offices of Betty Nguyen Davis LLC, William A. Pannell, William A. Pannell, P.C., Kevin T. Moore, Atlanta, GA, for Plaintiffs.

G. Frank Nason, IV, Lamberth, Cifelli, Stokes Ellis & Nason, Atlanta, GA, for Defendant.

### ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

WENDY L. HAGENAU, Bankruptcy Judge.

The parties have submitted over 1,600 pages of briefs, affidavits, depositions and evidence in an attempt to convince the Court of their rights to commissions and fees generated by discovering some of the most well-known child and teen stars in television and movies. The sheer volume of material suggests there are numerous disputed issues of fact. The Court has nevertheless reviewed the materials in order to rule on the pending motion, and to provide a framework for, and hopefully streamline, the future trial.

On June 13, 2010, Hot Shot Kids, Inc. and Brenda Pauley (collectively "Plaintiffs") filed a Complaint Objecting to Discharge of Debtor against Joy A. Pervis ("Pervis" or "Defendant") alleging claims of fraud, breach of fiduciary duty, usurpation of corporate opportunities, tortious interference with contractual and business relations, theft, and breach of contract and seeking a determination that such claims are non-dischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4), and 523(a)(6). The Complaint was amended on October 2, 2012.

Before the Court now is Defendant's Motion for Summary Judgment ("Motion"). On March 19, 2013, the Court heard oral argument on the issues raised by the Motion. After oral argument, Pervis filed a Supplemental Brief [Docket No. 91], in which she appears to seek summary judgment as to certain facts and claims not discussed in the original Motion. Summary judgment is appropriate as to claims, not facts, and only those claims on which Pervis sought summary judgment in the original Motion and those matters which are "a subset of the larger issue raised by the party" are properly before the Court. *Ervco, Inc. v. Texaco Refining and Marketing, Inc.*, 422 F.Supp.2d 1084, 1086 (D.Ariz.2006). The Court can also rule on issues *sua sponte* that are evident from the record. *Id.* The original grounds for summary judgment articulated by Pervis are:

1. Summary judgment against Hot Shot Kids, Inc. ("HSKI") with respect to any claim relating to the JBE Talent (defined herein as "Exhibit A Talent") or commission relating thereto;

2. Summary judgment against Brenda Pauley ("Pauley") as to any claims relating to JBE Talent (Exhibit A Talent);

3. Summary judgment against Pauley as to any HSKI claims;

4. Summary judgment against HSKI as to any claim of usurpation of corporate opportunities or "funneling" clients to Osbrink Talent Agency ("Osbrink") or J. Pervis Talent Agency, Inc. ("JPTA");

5. Summary judgment as to Pervis' liability for the July 21, 2007 letter to HSKI clients;

6. Summary judgment as to claims that Pervis destroyed corporate records;

7. Summary judgment as to claims for conversion of HSKI funds prior to "July 30, 2005"; and

8. Summary judgment as to any Section 523(a)(4) claim related to Pervis as fiduciary.

Since this is a request for judgment on a complaint to determine the dischargeability of certain debts, the Court has authority to hear and finally determine this proceeding under 28 U.S.C. § 157(b)(1) as a core proceeding under 28 U.S.C. § 157(b)(2)(I).

### Standard for Motion for Summary Judgment

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). "The substantive law [applicable to the case] will identify which facts are material". *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 251–52, 106 S.Ct. at 2510, 2511–12. The party moving for summary judgment has "the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits if any' which it believes demonstrate the absence of a genuine issue of material fact." *United States v. Four Parcels of Real Prop.,* 941 F.2d 1428, 1437 (11th Cir.1991) (citing *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. at 2553). What is required of the moving party, however, varies depending on whether the moving party has the ultimate burden of proof on the issue at trial.

When the nonmoving party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material negating the opponent's claim' (cites omitted) in order to discharge this 'initial responsibility'. Instead, the moving party simply may 'show—that is, point out to the . . . court—that there is an absence of evidence to support the nonmoving party's case. (cites omitted). Alternatively, the moving party may support its motion for summary judgment with affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial.

*Four Parcels of Real Prop.,* 941 F.2d at 1437 (citing *Celotex,* 477 U.S. at 323–31, 106 S.Ct. at 2553–57).

Once this burden is met, the nonmoving party cannot merely rely on allegations or denials in its own pleadings. Fed.R.Civ.P. 56(e). Rather, the nonmoving party must present specific facts that demonstrate there is a genuine dispute over material facts. *Hairston v. Gainesville Sun Pub. Co.,* 9 F.3d 913, 918 (11th Cir.1993). Lastly, when reviewing a motion for summary judgment, a court must examine the evidence in the light most favorable to the nonmoving party and all reasonable doubts and inferences should be resolved in favor of the nonmoving party. *Hairston,* 9 F.3d at 918.

At its core, this dispute arises from the failed business relationship among Pervis, Pauley and Rebecca Shrager ("Shrager") while they worked in the child and teen talent industry. Pervis ultimately left HSKI on August 1, 2007. Plaintiffs filed suit against Pervis in Gwinnett County on June 19, 2009, making many of the allegations made here ("Gwinnett County Litiga-

tion"). While discovery was underway, Pervis filed this bankruptcy petition on May 24, 2010. Plaintiffs then brought the litigation to this Court in the form of the dischargeability complaint. The Plaintiffs' claims fall into three primary categories. The first category encompasses all claims related to certain talent listed on "Exhibit A" to HSKI's Shareholder Agreement, which Pervis calls JBE Talent ("Exhibit A Talent Claims"). The second category encompasses those claims related to non-Exhibit A Talent, which arise before Pervis resigned from HSKI ("Non–Exhibit A Pre–Resignation Claims"). The third category includes those claims related to non-Exhibit A Talent which arise after Pervis' resignation from HSKI ("Non–Exhibit A Post–Resignation Claims"). The undisputed facts will be discussed as each category of claims is discussed.[1]

## A. *Exhibit A Talent Claims*

Exhibit A Talent Claims are Pauley's and HSKI's claims of fraud, breach of an oral contract and conversion related to money generated by the list of names referenced in Section 6.1 of the HSKI Shareholder Agreement and attached to it as Exhibit A ("Exhibit A Talent"). Pauley asserts that Pervis committed fraud by concealing the fact that Osbrink was paying commissions on Exhibit A Talent. Pauley also asserts that Pervis breached her oral agreement with Pauley and converted the commissions. In total, Pauley asserts damages of $178,278.92. Pauley points to the list of Exhibit A Talent as well as the Osbrink Ledger (the "Ledger") as evidence that Pervis was receiving payments on Exhibit A Talent from Osbrink. (Pauley Dec. ¶ 30, Exs. A and B).

Pervis seeks summary judgment on the Exhibit A Talent Claims on the grounds (i) HSKI had no interest in the Exhibit A Talent; (ii) Pauley cannot assert any Exhibit A Talent claim directly as such claim must be asserted by JB Entertainment Group ("JBE"); and (iii) Pauley cannot assert any claim because Pervis was entitled to retain the money for independent work not covered by any agreement with Pauley.

The undisputed facts are as follows except where noted: In 1997, Pauley, Pervis, and Shay Griffin met and formed the talent agency, TG Inc. In 1999, TG Inc. held an open call and discovered the actress Dakota Fanning. In February 2000, Pauley and Pervis referred Ms. Fanning to Osbrink, a talent agency based in Los Angeles owned equally by Cindy Osbrink and its vice president, Scott Wine. The parties entered into an oral "mother/agency" agreement, whereby the agency receiving the referral pays agreed upon commissions for a period of time. Pursuant to this agreement, Osbrink paid a 3% commission for the work done by Ms. Fanning. (Pervis Dec. ¶¶ 4, 11, 12; Pauley Dec. ¶¶ 3, 5, 8; Declaration of Scott Wine [Docket No. 44], ¶¶ 2, 3, 4, 6, herein after "Wine Dec.").

In June 2000, Pauley and Pervis formed and became equal owners of JBE. Osbrink was instructed to make the checks previously payable to TG Inc., to JBE. In October 2002, TG Inc. was dissolved, all adult bookings and contracts were transferred to PeopleStore, Inc., and HSKI was formed to take over the child and teen responsibilities of TG Inc. Shay Griffin did

---

**1.** For ease of reference, the Declaration of Brenda Pauley [Docket No. 55 with exhibits continuing at Docket Nos. 56, 58, 59–63] is referred to as "Pauley Dec.". The Declaration of Rebecca Shrager [Docket No. 57 with ex- hibits continuing at Docket No. 64–72] is referred to as "Shrager Dec.". The Declaration of Joy Pervis [Docket No. 43] is referred to as "Pervis Dec.".

not continue in the business. Shrager was a 20% owner of HSKI, while Pauley and Pervis each owned 40%. Simultaneously, the parties entered into the HSKI Shareholder Agreement. Section 6.1 of the Shareholder Agreement, labeled "Noncompetition", references an Exhibit A list of talent and states that the parties "acknowledge and agree that the 'California Clients' listed on Exhibit A are the sole clients of JB Entertainment Group." The Exhibit A Talent list includes Dakota Fanning. (Pauley Dec. ¶¶ 9, 10, 16, 17, 39; Pervis Dec. ¶¶ 13, 14, 15, 21, 31; Wine Dec. ¶ 7).

The parties dispute the scope and duration of the mother/agency agreement with Osbrink. Scott Wine and Pervis assert it was Osbrink's policy that mother/agency agreements not last longer than three years and Pauley was informed of this upon entering into the agreement. (Wine Dec. ¶ 5). Pauley claims she initially negotiated an agreement with Osbrink whereby TG Inc. would receive a 3% commission on the work performed by Ms. Fanning as long as she remained with Osbrink. Pauley asserts Osbrink agreed to pay mother/agency commissions on all other talent referred to Osbrink as long as Osbrink represented the talent anywhere in the United States. (Pauley Dec. ¶ 8). Plaintiffs assert there was a second oral agreement made in 2002, when HSKI was created, which required Osbrink to pay commissions for current co-represented talent to JBE and future co-represented talent to HSKI. Osbrink does not agree with this characterization of the arrangements. (Pauley Dec. ¶¶ 10, 28; Shrager Dec. ¶¶ 11, 14; Deposition of Osbrink Talent Agency, pp. 45–46).

Pauley asserts she has not received any commissions from Osbrink since June 2004, when Pervis told Pauley that Osbrink would stop paying commissions on Exhibit A Talent. Pauley called and spoke to both Cindy Osbrink and Scott Wine. Scott Wine told Pauley that the mother/agency agreement with Osbrink had expired and that Osbrink would no longer pay 3% commissions to Pauley or Pervis. Pervis asserts Pauley never disputed Osbrink's right to terminate the mother/agency agreement. Pauley asserts she contested the decision. Pauley states, on several occasions thereafter, Pervis informed Pauley that Pervis was no longer receiving any money or commissions from Osbrink. (Pauley Dec. ¶ 8, 18, 27–31; Pervis Dec. ¶ 65; Wine Dec. ¶ 10).

Nevertheless, monies continued to be paid, by Osbrink's admission. In early 2005 (more than three years from its inception), Osbrink terminated the mother/agency agreement. Pervis claims she played no role in Osbrink's decision to terminate the agreement. Pervis asserts there was no continuation of the initial mother/agency agreement and characterizes her relationship with Osbrink after February 2005 as an entirely new business relationship. Pervis states that, in light of her reputation in the talent industry, Osbrink approached Pervis and extended an offer to join a "Management Team" for which Pervis would be expected to perform a more comprehensive set of activities for talent, including Exhibit A Talent (which included Ms. Fanning). In exchange, Pervis would receive 3% of the money generated by the work performed by the talent Pervis managed. (Pervis, Dec. ¶¶ 64, 65, 66, 67; Wine Dec. ¶¶ 9, 11, 12, 17).

Pauley alleges Pervis continued to receive the same commissions on Exhibit A Talent, but concealed the commissions first in a "secret" bank account and then by receiving them at her home address or through the business entities JPTA and Joy Pervis, Inc. ("JP Inc."). The "secret" account referred to by Pauley originated on July 13, 2004. The parties agree that

prior to this date, JBE had a bank account at Wachovia ("First Exhibit A Talent Account"). In June 2004, the First Exhibit A Talent Account was closed. Pervis states that, since JBE was never dissolved and Osbrink was continuing to pay commissions on the Exhibit A Talent, she opened a second bank account for the purpose of keeping the Exhibit A Talent commissions separate from the other HSKI accounts, and that, through bank error, the account was named "Hot Shot Kids Escrow Account" ("Second Exhibit A Talent Account"). Pauley alleges neither she nor Shrager knew of its existence until discovery during the Gwinnett County Litigation. Pauley admits, though, to receiving two personal checks totaling $12,000 dated October 20, 2004 and December 15, 2004 from the Second Exhibit A Talent Account which Pauley endorsed and cashed. The parties agree that on March 18, 2005, the remaining balance in the Second Exhibit A Talent Account was split evenly between Pauley and Pervis with each receiving $551.11 and the account was closed. (Pervis Dec. ¶¶ 33, 38, 41, 42; Pauley Dec. ¶¶ 29, 30, 43, 53, Ex. I; Shrager Dec. ¶ 14).

### Summary Judgment against HSKI on any Exhibit A Talent Claims

■ The Court agrees with Pervis' contention that summary judgment is appropriate as to HSKI because it had no claim to the Exhibit A Talent. Throughout the pleadings in the record and at the March 19, 2013 oral argument, the parties distinguished between Exhibit A Talent and other talent referred to Osbrink. Shrager alleges that HSKI was to be paid for Non–Exhibit A Talent and had an interest in the Osbrink commissions generated by Non–Exhibit A Talent (Shrager Dec. ¶ 24), but makes no claim to Exhibit A Talent. The HSKI Shareholder Agreement further memorializes the intent of the parties that HSKI have no interest in the Exhibit A Talent as it sets out Exhibit A Talent as separate and distinct from HSKI talent. As such, summary judgment against HSKI as to any Exhibit A Talent Claims is granted.

### Summary Judgment against Pauley individually on any Exhibit A Talent Claims

■ Next, Pervis requests summary judgment against Pauley, contending JBE, not Pauley, must assert the Exhibit A Talent Claims since it is the entity with a financial interest in the commissions. Generally, a shareholder seeking to recover misappropriated corporate funds may only bring a derivative suit. *Thomas v. Dickson*, 250 Ga. 772, 774, 301 S.E.2d 49 (1983). There are two exceptions to this rule. If a shareholder can show his injury is separate and distinct from the corporation or that the wrongdoer owed him a special duty, then the shareholder may maintain an individual action even if the corporation also has a cause of action arising from the same wrong. *Parks v. Multimedia Technologies, Inc.*, 239 Ga.App. 282, 294, 520 S.E.2d 517 (1999). A claim is individual when there has been violation of a duty owed directly to an individual as opposed to an injury arising out of harm to the corporation. *See Barnett v. Fullard*, 306 Ga.App. 148, 154, 701 S.E.2d 608 (2010). For example, where an action is based on a contract to which a shareholder is a party, or on a right belonging severally to him, or on a fraud affecting him directly, it is an individual action. *See Southwest Health & Wellness, LLC v. Work*, 282 Ga.App. 619, 625, 639 S.E.2d 570 (2006).

■ The second instance in which a shareholder may proceed individually is when the circumstances show that the reasons for the general rule requiring a derivative suit do not apply. *Rosenfeld v. Ro-*

*senfeld,* 286 Ga.App. 61 at 64, 648 S.E.2d 399 (2007) (citations omitted); *Parks,* 239 Ga.App. at 287, 520 S.E.2d 517 ("A shareholder may bring a direct action if the reasons for requiring a derivative suit are absent and if 'prejudice is unlikely and the "realistic objectives" of avoiding unfair access or distribution of corporate assets . . . to one side over the other are more effectively accomplished via a direct action.' ") (citations omitted). The reasons for requiring a derivative suit are to: 1) prevent a multiplicity of lawsuits by shareholders; 2) protect corporate creditors by putting the proceeds of the recovery back in the corporation; 3) protect the interests of all shareholders by increasing the value of their shares, instead of allowing a recovery by one shareholder to prejudice the rights of others not a party to the suit; and 4) adequately compensate the injured shareholder by increasing the value of his shares. *Parks,* 239 Ga.App. at 287, 520 S.E.2d 517; *Thomas,* 250 Ga. at 774, 301 S.E.2d 49. Often, the reasons for proceeding derivatively are absent in close corporations.

■ Here, the Court finds that Pauley may proceed individually on her Exhibit A Talent Claims against Pervis, notwithstanding the existence of JBE. First, the Court finds the injury is individual in nature as it was Pauley who personally participated with Pervis in negotiating the oral mother/agency agreement with Osbrink. The negotiations on the agreement occurred in 2000, prior to the formation of JBE in 2002. Secondly, as JBE was a closely held corporation of two members, the Court finds the general reasons for requiring a derivative suit do not apply. There is no risk of a multiplicity of lawsuits as the only shareholders are Pauley and Pervis. Neither party asserts there are any corporate creditors to protect and no creditors have come forward to seek payment from the commissions due JBE and generated by Exhibit A Talent. The only allegedly injured shareholder here is Pauley; thus, there is no concern about prejudicing other injured shareholders by excluding them from recovery. Lastly, as there is no readily available market for shares of a closely held corporation, forcing a derivative recovery would not adequately compensate Pauley by increasing the value of JBE's shares. Accordingly, Defendant's Motion for Summary Judgment against Pauley on the Exhibit A Talent Claims on the basis that the claims belong to JBE and not Pauley individually is denied.

*Summary Judgment on any claims of fraud or conversion or breach of oral contract*

Before addressing the merits of Plaintiffs' claims, the Court must address the obvious question of the statute of limitations. Because the timeliness of a claim is a "subset" of Pervis' contention that she is entitled to judgment as a matter of law on the claims, and because the statute of limitations issue is evident from the record, the Court raised the issue with the parties at oral argument. *See Ervco,* 422 F.Supp.2d at 1086. The Court has considered the positions of the parties on the statute of limitations issue.

■ Claims for fraud, conversion and breach of an oral contract all have a four-year statute of limitations. O.C.G.A. § 9–3–31 (fraud), O.C.G.A. § 9–3–32 (conversion), and O.C.G.A. § 9–3–25 (oral contract). The earliest possible claim was asserted by Pauley against Pervis on June 19, 2009 in the Gwinnett County Litigation, so the statute of limitations would bar claims arising prior to June 20, 2005 (more than four years earlier). Pauley argues, however, the statute of limitations was tolled until discovery of Pervis' alleged

fraud pursuant to O.C.G.A. § 9–3–96. Pauley alleges she was unaware of the Second Exhibit A Talent Account (which she calls the "secret account") until after the Gwinnett County Litigation was filed and discovery was underway.

 Courts have interpreted "discovery" to mean when "the actual fraud is discovered or by reasonable diligence should have been discovered." *Owen v. Mobley Const. Co., Inc.,* 171 Ga.App. 462, 462, 320 S.E.2d 255 (1984) (cites omitted). "Mere ignorance of the facts constituting a cause of action does not prevent the running of a statute of limitations." *Gerald,* 168 Ga.App. at 23. If there is sufficient notice, then it is the plaintiff's onus to exercise diligence to discover fraud. *Owen,* 171 Ga.App. at 462, 320 S.E.2d 255; *Stricker v. Epstein,* 213 Ga.App. 226, 229, 444 S.E.2d 91 (1994) (no tolling when shareholders and purchasers of securities stopped receiving monthly checks but failed to exercise right to inspect books of corporation). A plaintiff cannot seek to toll the statute of limitations simply because it did not make the actual discovery until recently. *See Jones v. Bd. of Regents of Univ. Sys. of Ga.,* 219 Ga.App. 448, 449, 466 S.E.2d 869 (1995); *see also Bauer v. Weeks,* 267 Ga.App. 617, 619, 600 S.E.2d 700 (2004) (no tolling when homeowner knew something was amiss, but avoided bringing action to discover problem).

 Here, all of the activity associated with the Second Exhibit A Talent Account arises outside of the four-year statute of limitations for fraud, conversion and breach of oral contract as the account was closed on March 18, 2005, more than four years prior to suit being filed on June 19, 2009. The Court finds the undisputed facts show that Pauley did not exercise reasonable diligence in discovering the alleged fraud as to the Second Exhibit A Talent Account as Pauley was put on no-

tice of the "secret" account when she received the two personal checks totaling $12,000 issued from the Second Exhibit A Talent Account on October 20, 2004 and December 16, 2004. Pauley endorsed and cashed these checks but never inquired as to their source. Again, on March 18, 2005, Pauley received and cashed a check in the amount of $551.11 when the Second Exhibit A Talent Account was closed. Pauley did not inquire as to its source. Pauley claims she did not notice that it was Pervis' personal address on the checks. (Pauley Dec. ¶ 43). She apparently also did not notice or inquire as to why the checks appeared so different. The Second Exhibit A Talent Account checks are identified as "escrow account", the account name is written in script, the checks are handwritten, and the name of the bank is in the lower left hand corner. By contrast, the HSKI checks are identified as "operating account", the account name is written in block letters, the checks are typed, the name of the bank is in the upper right corner, the name of the payee is written in the lower left corner, and the words "Hot Shot" are imprinted in large print in the center background of the check. (Compare Pauley Dec. Ex. I with Shrager Dec. Ex. J). The checks are obviously significantly different.

Pauley admits to being told that Osbrink was no longer paying commissions on Exhibit A Talent and to contesting the decision to terminate the mother/agency agreement. She states she did not receive any commission checks after June 2004. On the other hand, she endorsed and cashed three checks from an account of which she allegedly had no knowledge. It was Pauley's onus to exercise diligence to discover fraud and she did not do so. *Owen,* 171 Ga.App. at 462, 320 S.E.2d 255. Accordingly, the Court finds the statute of limitations for fraud, conversion and

breach of oral agreement bars all claims related to the Second Exhibit A Talent Account, as it closed March 18, 2005.

On the other hand, Pervis has shown no basis for Pauley discovering any such alleged claims related to payments on Exhibit A Talent and deposited in any account other than the Second Exhibit A Talent Account. The claims for payments made prior to June 20, 2005 would be barred by the statute of limitations unless tolled by Pervis' fraud. The disputed facts as to Pervis' fraud are discussed below. Thus, the Court cannot determine on this Motion whether the statute of limitations on Pauley's Exhibit A Talent Claims related to payments made and deposited in any account other than the "secret" account was tolled.

■■■ Pauley's Exhibit A Talent claims are based on fraud, conversion and breach of oral contract. To prove fraud under Georgia law, a plaintiff must establish five elements: (1) the defendant made a false representation or omission of a material fact; (2) the defendant had knowledge the misrepresentation was false at the time of making it; (3) the defendant deceptively intended to induce the plaintiff to act or refrain from acting; (4) the plaintiff justifiably relied on the representation; and (5) the plaintiff suffered damages as a result of his reliance. O.C.G.A. § 51–6–2; *Home Depot U.S.A., Inc. v. Wabash Nat. Corp.,* 314 Ga.App. 360, 367, 724 S.E.2d 53 (2012) (cites omitted).

■■■■ Conversion is the deprivation of possession of property. O.C.G.A. § 51–10–1. It occurs through the exercise of dominion over the personal property of another, in hostility to his rights. *Parris Props., LLC v. Nichols,* 305 Ga.App. 734, 744–45, 700 S.E.2d 848 (2010) (cites omitted). A prima facie case for conversion requires (1) title to the property; (2) possession by the defendants; (3) demand for possession; and (4) refusal to surrender

property. *Taylor v. Powertel, Inc.,* 250 Ga.App. 356, 358, 551 S.E.2d 765 (2001). Although the statute refers to "personalty," the tort embodies the common law action of trover, and therefore applies to specific money as well, when the money is identifiable or traceable. *See Decatur Auto Center v. Wachovia Bank, N.A.,* 276 Ga. 817, 583 S.E.2d 6 (2003); *Grant v. Newsome,* 201 Ga.App. 710, 411 S.E.2d 796 (1991). Finally, breach of an oral agreement requires the establishment of the terms of the oral agreement and, of course, a party's failure to comply therewith.

■■■ Pauley alleges that, after the closure of the Second Exhibit A Talent Account, Pervis continued to receive payments from Osbrink until 2011 and that the "Management Team" concept was merely a continuation of the original mother/agency agreement set in place in 2000. Pervis disputes this. The parties dispute the terms of the original agreement between Pauley and Pervis and as to whether Pervis' services after termination of the agreement with Osbrink continued unchanged. If the agreement between Pauley and Pervis required the sharing of all commissions on Exhibit A Talent, then Pauley *may* have a claim for breach of that agreement or conversion or fraud, if the Court finds intent to deceive. Reviewing the evidence in the light most favorable to Pauley and resolving all inferences in her favor, the Court denies summary judgment on Pauley's claims of fraud, conversion and oral contract related to Exhibit A Talent for moneys paid by Osbrink and deposited into any accounts other than the Second Exhibit A Talent Account through 2011.

**B. Non–Exhibit A Talent Pre–Resignation Claims**

The Non–Exhibit A Talent Pre–Resignation Claims are Plaintiffs' claims that (1)

Pervis usurped HSKI business opportunities by funneling clients to JPTA or Osbrink; (2) Pervis tortiously interfered with the business and contractual relationships of HSKI by funneling clients to JPTA or Osbrink; (3) Pervis breached her fiduciary duty to HSKI by concealing that she was (a) paying for personal expenses with HSKI credit cards or from HSKI accounts, (b) retaining proceeds generated at several open calls which should have gone to HSKI, and (c) not signing talent to exclusive agreements with HSKI; (4) Pervis stole or converted funds from HSKI by (a) paying for personal expenses with HSKI credit cards or from HSKI accounts and (b) retaining proceeds generated at several open calls which should have gone to HSKI; (5) Pervis committed fraud by personally profiting from clients allegedly funneled to Osbrink or JPTA by receiving commissions or other payments which should have been paid to HSKI, paying for personal expenses with HSKI credit cards or from HSKI accounts and retaining proceeds generated at several open calls which should have been paid to HSKI; and (6) Pervis breached the noncompete clause in the HSKI Shareholder Agreement.

Pervis moves for summary judgment against HSKI as to any claim of usurpation of corporate opportunities or funneling clients to Osbrink or JPTA on the grounds that the Non–Exhibit A Talent was not a business opportunity of HSKI and Pervis was allowed to compete outside of the Territory per the HSKI Shareholder Agreement. The Court construes the Motion to include Plaintiffs' claims for tortious interference because Plaintiffs combine the two causes of action and supporting facts into one count in their Second Amended Complaint. Pervis also moves for summary judgment against Pauley on the Non–Exhibit A Talent Pre–Resignation Claims, because the claims belong to HSKI and not to Pauley individually. Pervis does not seek summary judgment on the other Non–Exhibit A Talent Pre–Registration Claims.

The following facts relevant to the Motion are undisputed, except as indicated: When HSKI was formed, Shrager was the CEO of PeopleStore, Inc.[2] and became the CFO of HSKI. Pervis was initially hired as an agent for HSKI, but ultimately became president of HSKI. (Shrager Dec. ¶ 2, 6, 38; Pervis Deposition Jan. 12, 2012 p. 31). With the creation of HSKI, the parties entered into a Shareholder Agreement, Section 6.1 of which states:

> The Original Shareholders acknowledge that the business of the representation of children in the entertainment business is the primary reason for the founding of the Company and that.... the additional reason for forming the business was the probability of gaining significant market dominance in the geographic area comprising a 100 mile radius from 2004 Rockledge Road, N.E. Atlanta, Georgia (the "Territory").

The Agreement further states that during the term of the Agreement, "Neither Pervis nor Pauley ... shall engage directly or indirectly, whether as employee or through investment in any entity, in the business of representing clients or companies in the entertainment business within the Territory ...". The Agreement allows Pervis and Pauley to engage in such activities in the Territory "in conjunction with the activities of a talent manager, rather than a talent agent, where such activities involve the management of the careers of such

---

**2.** Shrager refers to HSKI as a "division of PeopleStore. Inc". (Shrager Dec. ¶ 4). Pauley says HSKI was a separate corporation but promoted as a division of PeopleStore. (Pauley Dec. ¶ 10).

talent clients rather than the direct placement of such clients in talent assignments in return for a commission for such placements." (Pauley Dec. ¶ 16; Pervis, Dec. ¶ 21; Shrager Dec. ¶¶ 8, 13).

While president and a 40% shareholder in HSKI, Pervis performed work for both Osbrink and Actors Models and Talent for Christ ("AMTC"). Pervis admits to being a speaker and judge at AMTC scouting events. Pauley and Shrager were aware of Pervis' involvement with AMTC. (Pervis Dec. ¶ 5 1; Pauley Dec. ¶ 19; Shrager Dec. ¶ 17). Beginning in 2005, Pervis worked as a part of the Osbrink Management Team as discussed above. Pervis did not disclose the fact that she was on the Osbrink Management Team to Shrager or Pauley until at least 2007. Pervis referred talent not on Exhibit A which had moved to Los Angeles to Osbrink. According to the Ledger, between February 2005 and early January 2007, checks from Osbrink on Non–Exhibit A Talent were directed to Pervis individually. Sometime in early 2007, Pervis created JP Inc., her wholly owned corporation. From January 2007 through and beyond the effective date of Pervis' resignation on August 1, 2007, the Ledger reflects that Osbrink made payments generated by Non–Exhibit A Talent to JP Inc. (J. Pervis Dep. Jan. 12, 2012, p. 18, 31; Pauley Dec. ¶ 32).

Jayme Pervis ("Jayme"), Pervis' daughter-in-law, joined HSKI as an intern in 2004. She became an agent in 2006. (Declaration of Jayme Pervis [Docket No. 82], referred to herein as "Jayme Dec.", ¶ 2). While Pervis and Jayme were employed at HSKI, JPTA was formed. JPTA is a Georgia corporation of which Jayme is secretary and Jack Pervis, Pervis' husband, is CEO and CFO. JPTA invoiced some HSKI talent while Pervis was employed at HSKI. Pervis claims this was done pursuant to a split agency agreement, but Pauley and Shrager deny the existence of such an agreement. (Pervis Dec. ¶ 60; Pauley Dec. ¶ 21, 23, 46, Ex. H; Shrager Dec. ¶¶ 17, 22). The evidence supports that, upon discovering the JPTA billing, Shrager directed Jayme to reinvoice the talent to HSKI and HSKI was paid on all invoices, except the Vienna Sausage account. (Pauley Dec. ¶ 25, Ex. G; Shrager Dec. ¶¶ 17, 18, Exs. H, L; Pervis Dec. Ex. 13).

While employed at HSKI, Pervis attempted to negotiate a stock buy-out with Pauley and Shrager to obtain majority control of HSKI. When she was unsuccessful, she transferred her 40% interest in HSKI stock to her son, Shaun Pervis, on July 16, 2007. On July 19, 2007, she tendered both her own and Jayme's resignation letters to Pauley and Shrager. Pervis' resignation was effective August 1, 2007 and Jayme's resignation was dated as of June 25, 2007. In connection with her resignation, Jayme signed a notarized letter stating she had deleted all HSKI contacts from her "personal computer". (Pervis Dec. ¶¶ 54–5; Pauley Dec. ¶ 21, 24, Exs. C, D and G; Shrager Dec. ¶¶ 18, 19, 22, 31).

Two days later, on July 21, 2007, Pervis sent a letter to HSKI's clients ("Joy's Letter to Clients") informing them of her departure from HSKI. (Pervis Dec. Ex. 9; Pauley Dec. Ex. F). Joy's Letter to Clients informs talent that Pervis would no longer be working as an agent for HSKI and advises talent that it may remain with Hot Shot Kids or, since it is under no contract with HSKI, seek other representation. Joy's Letter to Clients provides a list of other "reputable agencies that specialize in kids and teens" and the list includes JPTA. Joy's Letter to Clients lists Jayme as the contact for JPTA. In three places Joy's Letter to Clients instructs the talent to contact Shrager or Pauley. On

the same day, despite signing the letter stating she had deleted all HSKI contacts from her computer, Jayme sent an email to HSKI talent which informs talent that she recently resigned her position at HSKI and invites the talent to join her new business, JPTA ("Jayme's Email to Clients"). (Pauley Dec. Ex. F).

### Summary Judgment as to Pauley on any Non–Exhibit A Talent Pre–Resignation Claims

▮ The Court finds summary judgment is appropriate against Pauley for any Non–Exhibit A Talent Pre–Resignation Claims Pauley asserts, other than breach of the Shareholder Agreement. Those claims are the claims of HSKI. As discussed above, it was HSKI opportunities that Pervis allegedly usurped, HSKI business relationships with which Pervis allegedly interfered, and HSKI monies Pervis allegedly converted. Since HSKI has asserted the claims, no basis for a derivative suit exists. *See Thomas,* 250 Ga. at 774, 301 S.E.2d 49; *see also Rosenfeld,* 286 Ga.App. at 64–65, 648 S.E.2d 399. Pauley's Non–Exhibit A Talent Pre–Resignation Claims, other than breach of the Shareholder Agreement, are not separate and distinct from HSKI's. Pauley may, however, assert a claim for breach of the Shareholder Agreement since she is a party to it individually. Pervis did not seek and the Court does not grant summary judgment as to Pauley's breach of contract claim.

### Summary judgment as to any pre-resignation usurpation of corporate opportunities claims

HSKI asserts that Pervis usurped business opportunities while an officer of HSKI by (1) scouting for and referring talent discovered at AMTC events to Osbrink rather than HSKI, (2) referring any Non–Exhibit A Talent to Osbrink, (3) performing work for Non–Exhibit A Talent for which Osbrink compensated Pervis as a member of a "Management Team", and (4) funneling HSKI clients to JPTA. HSKI claims it was unaware that Pervis was placing talent through any other agency while she was employed by HSKI and interpret the HSKI Shareholder Agreement to mean Pervis was prohibited from working for any other entity whether placing talent in California or any other state. HSKI states that any income Pervis received from Osbrink prior to her resignation from HSKI should have been paid to HSKI because any talent for which Pervis was compensated by Osbrink was an HSKI opportunity. HSKI asserts Pervis used JPTA to usurp corporate opportunities by individually funneling and invoicing or directing Jayme to funnel or invoice clients to JPTA prior to Pervis' resignation.

In response to the allegations, Pervis argues any talent she placed through Osbrink was either placed or booked outside of the Territory (as defined in the Shareholder Agreement) or had moved outside of the Territory before being placed with Osbrink. Pervis asserts that JP Inc was formed for work done outside the Territory with Osbrink and AMTC, and for other seminars and workshops she conducted. She states JP Inc. never acted as an agent, booked talent, or attended casting calls within the Territory. Pervis asserts there was never a mother/agency agreement between HSKI and Osbrink, and no "mother/agency commissions" were to be paid to HSKI. Pervis explains the payments by Osbrink were for work performed by Pervis while a member of the Osbrink Management Team, which required many more hours to be spent and much more involvement by Pervis. Wine agrees with Pervis' description of events. As to JPTA, the evidence shows that all of the commissions relating to the split agency agreement

were reinvoiced by HSKI, with the exception of the Vienna Sausage account.

■■■ An action for usurpation allows a corporation to sue an officer or director for the "appropriation, in violation of his duties, of any business opportunity of a corporation." O.C.G.A. § 14-2-831(a)(1)(C). An officer or director owes the corporation the duties of loyalty, good faith and fair dealing. *Phoenix Airline Services, Inc. v. Metro Airlines, Inc.*, 260 Ga. 584, 587, 397 S.E.2d 699 (1990). The prohibition on usurpation of corporate opportunities is a "specie of the command that fiduciaries act with undivided loyalty, and is another manifestation of the requirement of utmost good faith." *Quinn v. Cardiovascular Physicians, P.C.*, 254 Ga. 216, 218, 326 S.E.2d 460 (1985). Usurpation involves a two-part inquiry: (1) whether the appropriated opportunity rightfully belonged to the corporation; and (2) whether the corporate official violated a fiduciary duty in appropriating the opportunity. *Southeast Consultants v. McCrary Eng'g Corp.*, 246 Ga. 503, 508, 273 S.E.2d 112 (1980). The test for determining a corporate opportunity varies depending on whether the defendant is an existing or former officer or director. Pervis is an *existing* officer with respect to the Pre-Resignation Claims. In this instance, the determination of whether an opportunity rightfully belonged to HSKI is accomplished through the "line of business test" which evaluates whether an activity is "intimately or closely associated with the existing or prospective activities of the corporation." *McCrary*, 246 Ga. at 508, 273 S.E.2d 112; *Quinn*, 254 Ga. at 218, 326 S.E.2d 460 (1985). As such, an opportunity will be deemed to rightfully belong to HSKI if it is an opportunity that (a) HSKI could financially undertake; (b) is in HSKI's line of business and of practical advantage to it; (c) in which HSKI has a

reasonable expectancy; and (d) if taken by Pervis, would bring her self-interest into conflict with that of HSKI. *Brewer v. Insight Tech., Inc.*, 301 Ga.App. 694, 696, 689 S.E.2d 330 (2009); *Parks*, 239 Ga.App. at 288–89, 520 S.E.2d 517. Although not determinative, a court may look to a shareholder agreement as a useful source of information and guidance on what constitutes a corporation's "line of business". *Havens v. Attar*, 1997 WL 55957 (Del.Ch. Jan. 30, 1997).

■■■ Once it is established that an appropriated opportunity rightfully belonged to the corporation, the next inquiry is whether the corporate official violated a fiduciary duty in appropriating the opportunity. When the business opportunity is a relationship with a customer, solicitation by a current officer for the officer's new business venture may be a violation of the officer's fiduciary duty because it would be in direct competition with the corporation. *Keg Techs., Inc. v. Laimer*, 436 F.Supp.2d 1364, 1376 (N.D.Ga.2006); *Brewer*, 301 Ga. App. at 696–97, 689 S.E.2d 330. "[S]imply making plans" to start a competing company while still employed by the corporation does not constitute a breach of fiduciary duty. *Keg*, 436 F.Supp.2d at 1376 (finding no breach until active solicitation of business for competing enterprise); *Instrument Repair Serv., Inc. v. Gunby*, 238 Ga.App. 138, 518 S.E.2d 161 (1999) (holding likewise). No breach may occur if the officer specifically informs the corporation of the new business opportunities and the corporation declines to take them. *Gunby*, 238 Ga.App. at 141, 518 S.E.2d 161. An officer may breach its fiduciary duty to a corporation by directing an employee to behave in such a way as would constitute a breach. *Physician Specialists in Anesthesia, P.C. v. MacNeill*, 246 Ga.App. 398, 539 S.E.2d 216 (2000)(summary judgment unwarranted amid allegations departing

shareholder used employee to surreptitiously copy patient files and records).

The first question then is whether the opportunities Pervis directed to herself, to Osbrink or to JPTA were in the line of business of HSKI. Both parties argue about the activities permitted to Pervis under section 6.1 of the Shareholder Agreement. Pervis argues the limitation on her competition is only that set out in the Shareholder Agreement and the prohibited activities are limited to the Territory, a 100–mile radius around HSKI's location. HSKI, on the other hand, argues the Shareholder Agreement prohibits a wide variety of activities not limited by the Territory. Further, HSKI argues that, even if actions were not prohibited by the Shareholder Agreement, they may nevertheless be corporate opportunities, the usurpation of which constitutes a violation of Pervis' fiduciary duty.

█ Having read section 6.1 of the Shareholder Agreement, the Court finds it is ambiguous. The parties are certainly unable to agree on the scope of activity prohibited by the Agreement. On its face, the Agreement prohibits Pervis from engaging directly or indirectly as an employee or through investment in any entity in the business of representing clients or companies in the entertainment business within the Territory. A talent agent, though, may find a prospective actor in the Territory who works in the Territory, which all parties agree is prohibited. A talent agent may find a prospective actor in the Territory but place him in work outside the Territory. Pervis believes this situation is not covered by the noncom-

pete but HSKI contends it is. A talent agent may find a prospective actor outside the Territory and place him in work outside the Territory.[3] Lastly, a talent agent may find a prospective actor outside the Territory and place him to work inside the Territory.[4] In addition to a dispute over the meaning of "Territory", the parties disagree over the portion of the noncompete which allows Pervis to engage in activities in the Territory "in conjunction with the activities of a talent manager, rather than a talent agent, where such activities involve the management of the careers of such talent clients rather than the direct placement of such clients in talent assignments in return for a commission of such placements." Pervis argues the funds she received from Osbrink after 2005 were all related to her duties as a talent manager and not as a talent agent. (Pervis Dec. ¶ 66–68). Pauley and Shrager, on the other hand, argue Pervis continued with the same activities as had previously been covered by the Osbrink mother/agency agreement and included as tasks of a talent agent. (Pauley Dec. ¶¶ 32, 48).

█ Given the ambiguity of the noncompete provision of the Shareholder Agreement, the parties are permitted to submit parole evidence as to their intent and understanding of the provision as long as it does not add to, take from or vary the writing itself. *Andrews v. Skinner*, 158 Ga.App. 229, 230, 279 S.E.2d 523 (1981). Since the facts are disputed, the Court cannot determine without trial the meaning of the Shareholder Agreement, which the Court must discern before determining

---

**3.** This includes any talent Pervis discovered while scouting at various talent shows and other events across the country. (Pervis Dec. ¶ 68).

**4.** Pervis states that at least one child, Devon Gearhart, was located in Los Angeles and Pervis placed Mr. Gearhart with Osbrink. When Mr. Gearhart worked within the HSKI Territory, though, the work was invoiced by HSKI. (Pervis Dec. ¶ 73).

whether any of the opportunities taken by Pervis in connection with Osbrink or JPTA were within HSKI's line of business and therefore corporate opportunities.

Even if an opportunity is within HSKI's line of business, the Court must determine that the opportunities could be undertaken by HSKI. *See Brewer,* 301 Ga.App. 694, 689 S.E.2d 330; *Parks,* 239 Ga.App. 282, 520 S.E.2d 517. Pervis argues that, because HSKI was not licensed outside Georgia, it could not take advantage of opportunities outside Georgia. The Court notes Pauley and Pervis as Georgia residents worked with and were compensated by a California agency for work performed by talent in California. Pervis has not explained why the same could not have happened with any Non–Exhibit A Talent. Pervis has not argued HSKI could not take advantage of opportunities in Georgia. The Court therefore denies the Motion for Summary Judgment as to usurpation of corporate opportunities in connection with Pervis' pre-resignation activities with Osbrink and JPTA, except as discussed below.

The Court will grant summary judgment as to any claims that Pervis usurped HSKI business opportunities by invoicing talent through JPTA prior to Pervis' resignation, except any claim related to the Vienna Sausage account. HSKI has pointed to no evidence other than the Vienna Sausage account that a corporate opportunity was diverted to JPTA by JPTA invoicing the account. While the parties dispute the existence of a split agency agreement, the undisputed fact is that every invoice identified by Plaintiffs as sent by JPTA pursuant to the split agency agreement was re-invoiced by HSKI, with the exception of the Vienna Sausage account. The invoiced opportunities were corporate opportunities but were not appropriated by JPTA, and HSKI suffered no damage from the invoic-

ing. Summary judgment is therefore proper as to the invoiced opportunities except the Vienna Sausage account.

*Summary judgment as to any
pre-resignation tortious
interference claims*

HSKI alleges that Pervis tortiously interfered with HSKI's business and contractual relations prior to Pervis' effective resignation date on August 1, 2007. HSKI states that Joy's Letter to Clients as well as her behavior thereafter, was a willful and malicious act to obtain HSKI's talent base. HSKI asserts that Pervis shut down the HSKI offices in an effort to obtain the HSKI talent list and solicit the HSKI talent for JPTA, and thereafter purposefully and willfully refused to provide company or talent records to HSKI in an effort to prevent HSKI from contacting talent to explain Pervis' departure from HSKI and retain its client base. HSKI claims that Pervis contacted HSKI clients prior to her resignation or directed Jayme to contact clients between June 25, 2007, and July 19, 2007, in an effort to secure the talent's representation by JPTA. HSKI claims Jayme acted at Pervis' direction when Jayme sent Jayme's Email to Clients after indicating she had deleted all HSKI client contacts from her computer. Finally, HSKI claims that Pervis tortiously interfered with HSKI business and contractual relations by directing Jayme to invoice talent to JPTA, which belonged to HSKI. HSKI claims that within a week of Pervis' and Jayme's resignation, HSKI lost 154 clients.

In response, Pervis asserts that while an officer with HSKI, she did not contact any talent to ask them to switch talent agencies to JPTA, nor did she divert any current or potential talent away from HSKI to JPTA. Pervis states she did not destroy or delete any information from HSKI books or records nor divert any HSKI e-

mails upon her resignation. Pervis denies that Joy's Letter to Clients was done in an effort to cause injury to HSKI's business or contractual relations with talent and was merely a truthful statement to talent regarding why Pervis left HSKI and what the talents' future options were in light of the circumstances. Pervis admits to invoicing talent to JPTA, but claims that she on behalf of HSKI had entered into a split agency agreement with JPTA with respect to some of the talent and that Shrager and Pauley were aware of the split agency agreement.

■ To establish a tortious interference claim, HSKI must establish that Pervis (1) acted improperly and without privilege; (2) acted purposely and with malice and with the intent to injure; (3) induced HSKI talent not to continue a business relationship with HSKI; and (4) HSKI suffered financial injury as a result. *See Gordon Doc. Prods., Inc. v. Serv. Techs., Inc.*, 308 Ga.App. 445, 449, 708 S.E.2d 48 (2011); *see also* O.C.G.A. § 51–12–30. In light of the fact that HSKI has offered no proof of existing contracts with specific talent with which Pervis allegedly interfered, the Court will grant summary judgment as to any claims of tortious interference with contractual relations. *Lake Tightsqueeze, Inc. v. Chrysler First Financial Services Corp.*, 210 Ga.App. 178, 181, 435 S.E.2d 486 (1993).

■ A grant of summary judgment as to tortious interference with business relations is improper at this time for several reasons. First, the Court has already held that disputed issues of fact remain as to whether Pervis violated the Shareholder Agreement or usurped corporate opportunities in her dealings with Osbrink and JPTA. If the Court should determine, after trial, that the actions violated either the Shareholder Agreement or Pervis' fiduciary duty, such a finding would provide a basis for finding that Pervis acted improperly and without privilege with respect to those relationships. Second, Plaintiffs have submitted evidence, which, when considered in the light most favorable to them, could support a finding of Pervis acting purposefully and with malice and with the intent to injure. In particular, the allegations regarding Jayme's actions, allegedly taken at Pervis' direction prior to her departure, the disputed fact as to whether Jayme copied contact lists before her departure at Pervis' behest, Jayme's continued access of HSKI emails post-resignation allegedly at Pervis' direction, and Pervis' failure to provide company or talent records to HSKI after her resignation could support a finding of malice and intent to injure. There is no dispute among the parties that the actions taken, whether proper or improper, resulted in a significant amount of HSKI's child and teen business being redirected to JPTA. While Pervis denies directing Jayme to take any of the actions, the Court is unwilling to grant summary judgment based on that denial alone. The Court notes the new company, "J. Pervis Talent Agency", could be construed by an uninformed client to mean "Joy Pervis Talent Agency", despite Jayme's explanation to the contrary in her email. Moreover, JPTA's principals were Pervis' husband and daughter-in-law who had not previously had a talent company. All of these circumstances are sufficient, again when taken in the light most favorable to the Plaintiffs, to support a finding of tortious interference.

■ Finally, the Court notes the alleged interference must be with a third party because a party cannot interfere with its own business relationship. *H & R Block Eastern Enterprises, Inc. v. Morris*, 606 F.3d 1285, 1295 (11th Cir.2010); *MAU, Inc. v. Human Techs., Inc.*, 274 Ga.App. 891, 896, 619 S.E.2d 394 (2005). The de-

fendant must be a "stranger" to both the contract *and* the business relationship giving rise to and underpinning the contract. *GT Software, Inc. v. webMethods, Inc.*, 465 Fed.Appx. 844, 846 (11th Cir.2012) (cites omitted). In Georgia, the stranger doctrine is broadly interpreted, and the Supreme Court noted its intent was to limit the number of entities that could bring a tortious interference action. *Atlanta Mkt. Ctr. Mgmt. Co. v. McLane*, 269 Ga. 604, 609, 503 S.E.2d 278 (1998). Still, a corporate officer may be liable for interfering with a contract of the corporation if the officer disregarded the corporate entity or acted outside the scope of the officer's authority to the corporation's detriment. *See Parks*, 239 Ga.App. at 292, 520 S.E.2d 517. The Court cannot determine if Pervis was a stranger to the underlying business relationships without determining whether she acted outside her authority. As these facts are disputed by the parties, summary judgment is improper at this juncture.

## C. Non–Exhibit A Talent Post–Resignation Claims

The Non–Exhibit A Talent Post–Resignation Claims are (1) Pervis breached the noncompete clause contained in Section 6.1 of the HSKI Shareholder Agreement by working at JPTA indirectly as an agent after her resignation on August 1, 2007; (2) Pervis violated the noncompete through the work she performed for Osbrink as an independent talent scout, part of Osbrink's Management Team, or in any other fashion resulting in Pervis receiving monies on Non–Exhibit A Talent during the noncompete period; and (3) Pervis usurped HSKI corporate opportunities and tortiously interfered with HSKI business and contractual relationships both individually and through Jayme and/or JPTA. Pervis has sought summary judgment only on the third claim, although she argues the ac-

tions she took were not corporate opportunities because they did not violate the noncompete. Pervis also seeks summary judgment that the Non–Exhibit A Talent Post–Resignation Claims cannot be asserted by Pauley.

The following facts are undisputed unless otherwise indicated. After her resignation from HSKI, Pervis informed Osbrink of her resignation and Osbrink made her an independent talent scout. As a talent scout, Pervis "scouted at various talent shows and other events across the country and referred a number of potential new clients to Osbrink" for which Osbrink would compensate Pervis if the talent was booked for jobs in the Los Angeles market. Pervis continued to act as a member of the Osbrink Management Team after her resignation. Osbrink made payments to JP Inc. of approximately $65,000 post-resignation. (Wine Dec. ¶ 15; Pervis Dec. ¶ 68; Ledger).

The parties dispute whether Pervis worked as an agent with JPTA. But it is undisputed that, between September 5, 2007 and September 1, 2009, JPTA issued several checks to her individually or to her wholly owned entity, JP Inc. Pervis signed rent and other expense checks for JPTA although she was not a signatory on the account. It is also undisputed that JPTA ultimately represented the vast majority of former HSKI talent. (Pauley Dec. ¶ 24, 47; Shrager Dec. ¶¶ 20, 35–6, 41, Ex. M). It is undisputed that Pervis performed work as an agent with JPTA after the expiration of the noncompete period and is currently employed by JPTA. (Pervis Dec. ¶¶ 62–3).

*Summary Judgment as to Pauley on any Non–Exhibit A Talent Post–Resignation Claims*

The Court finds summary judgment is appropriate against Pauley for any Non–

Exhibit A Talent Post–Resignation Claims Pauley asserts, other than breach of the Shareholder Agreement. As previously discussed, a claim for misappropriated corporate funds should be brought by or on behalf of the corporation. HSKI has asserted the claim. Pauley's Non–Exhibit A Talent Post–Resignation Claims are not separate and distinct from HSKI. Pauley may, however, assert a claim for breach of the Shareholder Agreement since she is a party to it individually.

### Summary Judgment against HSKI on any post-resignation usurpation of corporate opportunity claims

■■■■ HSKI alleges Pervis' work with Osbrink post-resignation was an HSKI corporate opportunity and HSKI is entitled to all funds paid by Osbrink to Pervis or her company.[5] HSKI also alleges that all former HSKI talent that was represented by JPTA post-resignation was a corporate opportunity. Since Pervis is a *former* officer with respect to the Post–Resignation Claims, the first prong—whether an opportunity rightfully belonged to a corporation—is accomplished through the "interest or expectancy" test. It identifies a business opportunity as one that arises from a "beachhead" consisting of a legal or equitable interest or an "expectancy" growing out of a pre-existing right or relationship. *United Seal & Rubber v. Bunting*, 248 Ga. 814, 815, 285 S.E.2d 721 (1982). A past relationship with customers alone is insufficient to create a reasonable expectancy absent a contractual agreement, an "exclusive arrangement" or a "finite aspect". *United Seal*, 248 Ga. at 815, 285 S.E.2d 721; *Ins. Indus. Consultants, LLC v. Alford*, 294 Ga.App. 747, 751, 669 S.E.2d 724 (2008) (no usurpation when clients prospective or had to annually renew contracts). "[T]he opportunity of dealing with certain customers [does] not constitute a business opportunity." *Alford*, 294 Ga.App. at 751, 669 S.E.2d 724. As one court has explained,

> The fact that [plaintiff] had established business relationships with its customers does not amount to the establishment of a "beachhead" that would make those relationships a corporate opportunity. In this regard, [plaintiff] may well have had an "interest" in keeping its customers or an "expectancy" that customers would continue to use its services in the sense that it anticipated they would. But nothing precluded any competitor from taking a customer away from [plaintiff] by proposing to provide services for less money or by convincing a customer that it could provide better service.

*In re Robustelli*, 430 B.R. 709, 729 (Bankr. N.D.Ga.2010).

■■■■ In this instance, the Court concludes HSKI has not provided any evidence the talent joining JPTA or the work Pervis did for Osbrink constituted opportunities that rightfully belonged to HSKI. Pervis notes HSKI has failed to produce a single contract or other evidence of a finite relationship or exclusive agreement between HSKI and Non–Exhibit A Talent. As the party moving for summary judgment, Pervis has fulfilled her initial responsibility of identifying for the Court an absence of a genuine issue of material fact. *Four Parcels of Real Prop.*, 941 F.2d at 1437. In response, HSKI has not met its burden of presenting specific facts that demonstrate there is a genuine dispute of material facts. *Hairston*, 9 F.3d at 918. HSKI and Pervis agree there were no written or exclusive contracts at the time

---

**5.** Pervis refers to this as 2007–2009 Talent. Plaintiffs made clear at oral argument they are claiming *all* funds paid by Osbrink to Pervis whether identified as 2007–2009 Talent or not.

Pervis resigned, but HSKI argues that without their knowledge, Pervis allowed all written or exclusive contracts with talent to expire. Allowing the expiration of contracts may be a basis for the *Pre*–Resignation Claims, but there is no dispute there were no written or exclusive contracts as of Pervis' resignation. Although Shrager attaches copies of contracts to her Declaration as examples of form exclusive HSKI contracts, the contracts are all terminable at will and for two-year terms. Moreover, none of the contracts supplied were with any talent included in the Ledger. (Pauley Dec. ¶¶ 13, 46; Shrager Dec. ¶ 9).

The past relationships HSKI had developed with the talent did not amount to a "beachhead" because, although HSKI may have had an interest or expectancy that the talent would choose to continue representation with HSKI, nothing precluded any competing talent agency, including JPTA, from taking the talent away by proposing to provide better service or representation. HSKI has pointed to no evidence in the record of a particular commercial, movie, or project whatsoever that HSKI expected to undertake with a specific child or teen after Pervis' resignation or for which HSKI had invested time or money prior to Pervis' resignation in anticipation of the project coming to fruition after Pervis' resignation, which would be analogous to the type of project deemed a business opportunity in *McCrary*. Accordingly, the talent signed by JPTA and the work done by Pervis were not corporate opportunities and Pervis did not violate any duties in appropriating them.[6] The Court grants Pervis' motion for summary judgment on HSKI's usurpation of corporate opportunity claim as to any post-res-

ignation activities with Non–Exhibit A Talent.

*Summary judgment on any post-resignation tortious interference claims*

HSKI alleges that Pervis' "funneling" of clients to Osbrink and JPTA constitutes tortious interference. HSKI points to alleged destruction of confidential HSKI information, and refusal to provide company or talent records to HSKI after her resignation as specific acts taken to interfere with HSKI's business relations with talent post-resignation. Without a doubt the majority of HSKI clients retained JPTA, but the specific acts of which HSKI complains are only relevant if a relationship protected by law exists.

▮▮▮ A contractual or business relation must exist between the plaintiff and a third party. *Lake Tightsqueeze, Inc.*, 210 Ga.App. at 181, 435 S.E.2d 486 (no interference where no existing contracts); *All Star, Inc. v. Fellows*, 297 Ga.App. 142, 147, 676 S.E.2d 808 (2009) (no interference where Plaintiff corporation not authorized to conduct business in same state as competitor formed by former employees). Importantly, it is not tortious interference for a former employee of a company to solicit its former employer's customer. *Tom's Amusement Co., Inc. v. Total Vending Servs.*, 243 Ga.App. 294, 298, 533 S.E.2d 413 (2000). "Fair competition is always legal, and absent a valid noncompete or nonsolicit covenant a former employee may go to customers whom he procured for the old employer and endeavor to persuade them to change their trade to his advantage." *Tom's*, 243 Ga.App. at 298, 533

---

6. Jayme's interception of a business opportunity from The Decisive Moment on August 3, 2007 if directed by Pervis could be one in which HSKI had a beachhead since the inquiry was made to HSKI. No evidence has been presented, though, that The Decisive Moment retained JPTA or Pervis. To the contrary, The Decisive Moment reported the interception to Shrager. (Pauley Dec., Ex. H).

S.E.2d 413. Further, the "stranger doctrine" precludes a finding of tortious interference with business or contractual relationships if the defendant is not a stranger to the relationship with which he or she allegedly interfered. *MAU, Inc.*, 274 Ga. App. at 896, 619 S.E.2d 394. The stranger doctrine applies to *former* employees when the employee was an "integral part" of the business relationship with which the former employer claims she interfered. *Tom's*, 243 Ga.App. at 298, 533 S.E.2d 413.

Here, HSKI asserts that the totality of the circumstances amount to tortious interference with HSKI's business and contractual relationships. Since none of the talent signing with JPTA or working with Osbrink had exclusive or written contracts with HSKI, the Court finds summary judgment is appropriate on any claim of tortious interference with contractual relations. *Lake Tightsqueeze*, 210 Ga. App. at 181, 435 S.E.2d 486. As to interference with business relations, the Court begins with the first general element required to establish tortious interference claims—that Pervis acted improperly or without privilege. The Court has granted summary judgment on HSKI's usurpation of corporate opportunity claims because HSKI failed to meet its burden of establishing that the JPTA or Osbrink talent was a HSKI business opportunity. Thus, the Court has already determined that Pervis' actions were not improper—she breached no fiduciary duty to HSKI post-resignation by soliciting talent.

Solicitation of former customers in violation of a valid noncompete agreement may satisfy the "improper" action prong of a tortious interference claim, but the stranger doctrine also precludes a finding of tortious interference in that case. Pervis is an essential entity to the purportedly injured relations, by HSKI's own allegations. HSKI alleges Pervis used her relationship with HSKI talent and her position with HSKI to "funnel" HSKI talent to JPTA and/or Osbrink. Pervis' interactions with talent made her an integral part of the business relationships developed between talent and HSKI such that HSKI's injured relations are inextricably a part of Pervis' dealings with the talent. *Tom's*, 243 Ga.App. at 298, 533 S.E.2d 413. Thus, in keeping with Georgia's broad interpretation of the stranger doctrine, the Court finds Pervis was not a stranger to the business relationships between HSKI and Non–Exhibit A Talent signing with JPTA and Osbrink. Accordingly, the Court grants Pervis' motion for summary judgment as to the Non–Exhibit A Talent Post–Resignation tortious interference claims.

### D. Summary judgment against HSKI as to "any other claims"

In the Motion for Summary Judgment, Pervis seeks summary judgment against HSKI as to "any other claims". Although that description is broad, the brief actually addresses three specific claims which the Court will address here.

First, Pervis argues her letter on July 21, 2007 sent to HSKI's clients does not form a basis for any claim against her. The Court agrees the letter alone would not be sufficient to support a claim. Plaintiffs have not identified any misstatement in the letter that would form a basis for fraud. An officer's decision to leave a company and start a new company, in and of itself, is not a violation of her breach of fiduciary duty, so long as she does not solicit the clients while an officer. *Keg*, 436 F.Supp.2d at 1376–77. Joy's Letter to Clients though does not stand alone but is joined with other actions in Plaintiffs' allegations. Claims of tortious interference and breach of fiduciary duty require the Court to look at the totality of the circum-

stances, not just one action in isolation. The Court therefore denies summary judgment on Joy's Letter to Clients.

Next, Pervis seeks summary judgment as to any claim that she destroyed corporate records. In response, the Plaintiffs state they do not claim she destroyed corporate records. Rather, they claim she did not provide records they have requested. Since there is no dispute on this allegation, the Court will grant the motion for summary judgment on any claim that Pervis destroyed corporate records. Any allegation that such corporate records were not provided upon request, however, may be used by the Plaintiffs in support of any surviving claims.

Finally, Pervis seeks summary judgment as to any claim for amounts she allegedly converted by making payments on personal expenses. The payments allegedly came from HSKI including the First and Second Exhibit A Talent Accounts. Pervis contends she was authorized to take a monthly allowance from HSKI and the payment of these expenses was in lieu of that monthly allowance. (Pervis Dec. ¶¶ 17, 18, 27). Pauley and Shrager dispute there was any agreement for such a monthly allowance and contend her payments of personal expenses were conversion. (Pauley Dec. ¶ 35; Shrager Dec. ¶ 10).

Pervis argues first there is no disputed issue of fact regarding her permission to make the payments. Given the contradictory affidavits of Pauley and Shrager, the Court must deny this request for summary judgment. Secondly, Pervis seeks summary judgment as to any claim for conversion based on any payments made prior to June 30, 2005. Upon further review, and the parties' stipulation, the Gwinnett County Litigation was filed on June 19, 2009. Acts of conversion allegedly occurring prior to June 20, 2005 would be barred by the four-year statute of limitation for conversion. Plaintiffs did not address this claim in their response but in oral argument generally acknowledged the four-year statute of limitations. Further, HSKI presented no evidence that any monies for Non–Exhibit A Talent were ever deposited into the First or Second Exhibit A Talent Accounts. As such, HSKI may not assert a claim for the conversion of any funds deposited into the First or Second Exhibit A Talent Accounts. Plaintiffs have raised no reason why the statute of limitations for any conversion from HSKI's account should be tolled. Summary judgment is therefore· proper to Pervis on HSKI's claim for conversion related to payment of Pervis' personal expenses prior to June 20, 2005 from any source.

### E. Summary Judgment on Pervis' standing as a fiduciary

■ Pervis seeks summary judgment on any allegation that a claim is non-dischargeable because she committed fraud or defalcation while acting in a fiduciary capacity. Under 11 U.S.C. § 523(a)(4), a debt is non-dischargeable if it is "for fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny". While fraud or defalcation must occur in a fiduciary capacity, larceny or embezzlement need not occur in a fiduciary capacity to make a debt non-dischargeable.

■ The term "fiduciary" as used in 11 U.S.C. § 523(a)(4) does not have the same meaning as it does under state law. The meaning of the word "fiduciary" in this section "is a question of federal law," *Smith v. Khalif (In re Khalif)*, 308 B.R. 614, 621–22 (Bankr.N.D.Ga.2004), although state law can be consulted in ascertaining whether such a duty has been imposed. *See Quaif v. Johnson*, 4 F.3d 950 (11th Cir.1993). A fiduciary relationship under Section 523(a)(4) is to be construed nar-

rowly. *Quaif, Id.* at 953 (citing *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934)). "Section 523(a)(4) requires that the debtor, acting as a fiduciary in accordance with an express or technical trust that existed prior to the wrongful act, committed an act of fraud or defalcation." *In re Lemmons,* 2005 WL 6487216 (Bankr.N.D.Ga.2005) (citing *Eavenson v. Ramey (In re Eavenson),* 243 B.R. 160, 164 (N.D.Ga.1999)). A technical trust has been defined by the Eleventh Circuit as "an express trust created by statute or contract that imposes trust-like duties on the defendant and that pre-exists the alleged defalcation," as opposed to constructive or resulting trusts. *Parker v. Ferland (In re Ferland),* 2010 WL 2600588 (Bankr.M.D.Ga.2010) (citing *Quaif,* 4 F.3d at 953–54). Thus, a plaintiff must show that (i) the debtor held a fiduciary position vis a vis the plaintiff under a technical, express or statutory trust; (ii) that the claim arose *while* the debtor was acting as a fiduciary; and (iii) that the claim is for fraud or defalcation.

■■■ A number of bankruptcy courts in Georgia have considered whether an officer or director of a Georgia corporation or a manager of a Georgia LLC or a partner in a partnership is a fiduciary under Section 523(a)(4). The near-unanimous result is that they are not. *See Tarpon Point, LLC v. Wheelus (In re Wheelus),* 2008 WL 372470 (Bankr.M.D.Ga.2008) (manager of limited liability company is not a fiduciary); *Davis v. Conner (In re Conner),* 2010 WL 1709168 (Bankr.M.D.Ga.2010) (partner is not a fiduciary); *Millburn Partners, LLC v. Miles (In re Miles),* 2011 WL 1124183 (Bankr.N.D.Ga.2011) (officer and director is not a fiduciary); *Blashke v. Standard (In re Standard),* 123 B.R. 444 (Bankr.N.D.Ga.1991) (general partner is not a fiduciary). In each instance, the court begins with the language of the stat-

ute defining the duties of the manager, officer, or the like. O.C.G.A. §§ 14–2–830 and 14–2–842 require an officer to act "in a manner he believes in good faith to be in the best interests of the corporation; and . . . with the care an ordinarily prudent person in a like position would exercise under similar circumstances." These Georgia statutes do not impose a heightened duty on the officer or director and do not use the term "fiduciary" to describe the duties or in any way speak in terms of a trust. There are no additional "fiduciary" duties imposed on Pervis by contract. Consequently, the Court joins those cited above in concluding that merely being an officer or director of a corporation, without more, does not create a fiduciary relationship for purposes of 11 U.S.C. § 523(a)(2)(A). The Court grants Pervis' Motion for Summary Judgment on the issue of whether she is a fiduciary.

Larceny or embezzlement, however, need not occur while the Debtor is acting in a fiduciary capacity to provide a basis for non-dischargeability under 11 U.S.C. § 523(a)(4). Plaintiffs have alleged both larceny and embezzlement as a basis for non-dischargeability and Pervis has not sought summary judgment on these theories.

### Conclusion

In conclusion, the Court grants Pervis' Motion for Summary Judgment as to the following:

1. HSKI has no claim to Exhibit A Talent.

2. Pauley's Exhibit A Talent Claims related to the Second Exhibit A Talent Account are barred by the statute of limitations.

3. Pauley has no Non–Exhibit A Talent Pre– or Post–Resignation claims, other than for breach of the Shareholder Agreement.

4. HSKI has no claim for tortious interference with contracts, either pre- or post-resignation.

5. HSKI has no claim for usurpation of corporate opportunities based on JPTA's invoicing of HSKI accounts, other than the Vienna Sausage account.

6. HSKI has no claim for usurpation of corporate opportunities for post-resignation activities.

7. HSKI has no claim for tortious interference with business relations for post-resignation activities.

8. Pervis did not destroy corporate records.

9. HSKI is barred by the statute of limitations from asserting a claim for conversion prior to June 20, 2005.

10. Pervis was not a fiduciary as that term is used in 11 U.S.C. § 523(a)(4).

Based on the claims stated in the Plaintiffs' Amended Complaint [Docket No. 39] and the claims on which summary judgment has been granted today, the following matters remain for trial:

1. Pauley's Exhibit A Talent Claims related to deposits in any account other than the Second Exhibit A Talent Account;

2. Pauley's and HSKI's claims for breach of the Shareholder Agreement;

3. HSKI's claims for usurpation of corporate opportunities for pre-resignation activities except the HSKI opportunities invoiced by JPTA other than the Vienna Sausage account;

4. HSKI's claims for tortious interference with business relations for pre-resignation activities, including Joy's Letter to Clients;

5. HSKI's claims of conversion related to payments made to Pervis or on her behalf after June 20, 2005;

6. HSKI's claims for breach of fiduciary duty related to payments to or on Pervis' behalf, open calls, and the failure to execute contracts with clients;

7. HSKI's claims for fraud related to payments made to or on Pervis' behalf, open calls, and pre-resignation activities with Osbrink on Non–Exhibit A Talent; and

8. Dischargeability under 11 U.S.C. § 523(a)(2), (a)(6) and (a)(4) (embezzlement and larceny only) of any claim determined.